ROBBINS GELLER RUDMAN
  & DOWD LLP
DAVID C. WALTON (167268)
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)
davew@rgrdlaw.com
        – and –
SAMUEL H. RUDMAN
58 South Service Road, Suite 200
Melville, NY  11747
Telephone:  631/367-7100
631/367-1173 (fax)
srudman@rgrdlaw.com

Attorneys for Plaintiff

[Additional counsel appear on signature page.]

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| WATERFORD TOWNSHIP POLICE & FIRE RETIREMENT SYSTEM, Individually and on Behalf of All Others Similarly Situated, <br><br> Plaintiff, <br><br> vs. <br><br> MATTEL, INC., CHRISTOPHER A. SINCLAIR, RICHARD L. DICKSON, KEVIN M. FARR and JOSEPH B. JOHNSON, <br><br> Defendants. | Case No. <br><br> <u>CLASS ACTION</u> <br><br> COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS <br><br><br><br><br> <u>DEMAND FOR JURY TRIAL</u> |

Plaintiff Waterford Township Police & Fire Retirement System, individually and on behalf of all others similarly situated, by plaintiff's undersigned attorneys, alleges the following based upon information and belief as to the investigation conducted by plaintiff's counsel, which included, among other things, a review of U.S. Securities and Exchange Commission ("SEC") filings by Mattel, Inc. ("Mattel" or the "Company"), securities analyst reports, press releases, and other public statements issued by, or about, the Company.  Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## JURISDICTION AND VENUE

1.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and §27 of the Securities Exchange Act of 1934 (the "Exchange Act") [15 U.S.C. §78aa].

2.     The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act [15 U.S.C. §§78j(b) and 78t(a)] and Rule 10b-5 promulgated thereunder by the SEC [17 C.F.R. §240.10b-5].

3.     Venue is proper pursuant to §27 of the Exchange Act, as many of the acts and conduct complained of herein occurred in this District, and the Company is headquartered in this District.

4.     In connection with the acts alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the New York Stock Exchange ("NYSE"), a national securities exchange.

## NATURE OF THE ACTION

5.     This is a securities class action on behalf of purchasers of Mattel publicly traded securities between October 20, 2016 and April 20, 2017, inclusive (the "Class Period"), seeking to pursue remedies under the Exchange Act.

**PARTIES**

6.      Plaintiff Waterford Township Police & Fire Retirement System, as set forth in the accompanying certification incorporated by reference herein, purchased Mattel securities during the Class Period and has been damaged thereby.

7.      Defendant Mattel is a multi-national toy manufacturing company that maintains its principal executive offices in El Segundo, California.

8.      Defendant Christopher A. Sinclair ("Sinclair") was the Company's Chief Executive Officer ("CEO") and Chairman of its Board of Directors until February 8, 2017, when defendant Sinclair resigned from his position as Mattel's CEO and became Executive Chairman of the Company's Board of Directors.

9.      Defendant Richard L. Dickson ("Dickson") is, and was at all relevant times, the Company's President and Chief Operating Officer.

10.      Defendant Kevin M. Farr ("Farr") is, and was at all relevant times, the Company's Chief Financial Officer.

11.      Defendant Joseph B. Johnson ("Johnson") is, and was at all relevant times, Senior Vice President and Corporate Controller of Mattel.

12.      Defendants Sinclair, Dickson, Farr and Johnson are collectively referred to herein as the "Individual Defendants."

13.      Because of the Individual Defendants' positions with the Company, they had access to the adverse undisclosed information about the Company's business, operations, operational trends, financial statements, markets and present and future business prospects via access to internal corporate documents (including the Company's operating plans, budgets and forecasts and reports of actual operations compared thereto), conversations and connections with other corporate officers and employees, attendance at management and Board of Directors meetings and committees thereof, and via reports and other information provided to them in connection therewith.

14.     Each of the above officers of Mattel, by virtue of their high-level positions with the Company, directly participated in the management of the Company, was directly involved in the day-to-day operations of the Company at the highest levels and was privy to confidential proprietary information concerning the Company and its business, operations, growth, financial statements and financial condition, as alleged herein.  The Individual Defendants were involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein, were aware, or recklessly disregarded, that the false and misleading statements were being issued regarding the Company, and approved or ratified these statements, in violation of the federal securities laws.

15.     The Individual Defendants, as officers and controlling persons of a publicly held company whose shares are registered with the SEC pursuant to the Exchange Act, are traded on the NYSE, and are governed by the provisions of the federal securities laws, each had a duty to promptly disseminate accurate and truthful information with respect to the Company's financial condition and performance, growth, operations, financial statements, business, markets, management, earnings and present and future business prospects during the Class Period.  In addition, the Individual Defendants had a duty to correct any previously issued statements that had become materially misleading or untrue, so that the market prices of Mattel publicly traded securities would be based upon truthful and accurate information.  The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

16.     The Individual Defendants also participated in the drafting, preparation and/or approval of the various public, shareholder and investor reports and other communications complained of herein and were aware of, or recklessly disregarded, the misstatements contained therein and/or the omissions therefrom, and were aware of their materially false and misleading nature.  Because of their Board membership and/or executive and managerial positions with Mattel, each of the Individual

1   Defendants had access to the adverse undisclosed information about Mattel's

2   business, prospects, financial condition and performance as particularized herein, and

3   knew (or recklessly disregarded) that these adverse facts rendered the positive

4   representations made by or about Mattel and its business and issued or adopted by the

5   Company materially false and misleading.

6        17.    The Individual Defendants, because of their positions of control and

7   authority as officers and/or directors of the Company, were able to and did control the

8   content of the various SEC filings, press releases and other public statements

9   pertaining to the Company during the Class Period.  Each Individual Defendant was

10  provided with copies of the documents alleged herein to be misleading prior to or

11  shortly after their issuance and/or had the ability and/or opportunity to prevent their

12  issuance or cause them to be corrected.   Accordingly, each of the Individual

13  Defendants is responsible for the accuracy of the public reports and releases detailed

14  herein and is therefore primarily liable for the representations contained therein.

15       18.    Each of the defendants is liable as a participant in a fraudulent scheme

16  and course of business that operated as a fraud or deceit on purchasers of Mattel

17  securities by disseminating materially false and misleading statements and/or

18  concealing material adverse facts.  The scheme: (i) deceived the investing public

19  regarding Mattel's business, operations, management and the intrinsic value of Mattel

20  securities; and (ii) caused plaintiff and other members of the Class to purchase Mattel

21  securities at artificially inflated prices.

22                              **CLASS ACTION ALLEGATIONS**

23       19.    Plaintiff brings this action as a class action pursuant to Federal Rule of

24  Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all those who

25  purchased Mattel publicly traded securities during the Class Period and who were

26  damaged thereby (the "Class").  Excluded from the Class are defendants and their

27  families, the officers and directors of the Company, at all relevant times, members of

28

their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

20.   The members of the Class are so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to plaintiff at this time and can only be ascertained through appropriate discovery, plaintiff believes that there are thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Mattel or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

21.   Plaintiff's claims are typical of the claims of the members of the Class, as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law complained of herein.

22.   Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class action and securities litigation.

23.   Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)   whether the federal securities laws were violated by defendants' acts as alleged herein;

(b)   whether statements made by defendants to the investing public during the Class Period misrepresented material facts about the business and operations of Mattel;

(c)   whether the prices of Mattel securities were artificially inflated during the Class Period; and

(d)   to what extent the members of the Class have sustained damages and the proper measure of damages.

24.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

**BACKGROUND**

25.     Defendant Mattel designs, manufactures, and markets a range of toy products worldwide.   Mattel's portfolio of brands and products (referred to collectively herein as "products") are currently grouped by the Company into the following four major brand categories:

> *Mattel Girls & Boys Brands* – including Barbie® fashion dolls and accessories ("Barbie"), Monster High®, Ever After High®, Polly Pocket®, and DC Super Hero Girls™ (collectively "Other Girls"), Hot Wheels® and Matchbox® vehicles and play sets (collectively "Wheels"), and CARS®, DC Comics®, WWE® Wrestling, Minecraft®, Max Steel®, BOOMco.®, Toy Story®, and games and puzzles (collectively "Entertainment").

> *Fisher-Price Brands* – including Fisher-Price®, Little People®, BabyGear™, Laugh & Learn®, and Imaginext® (collectively "Core Fisher-Price"), Thomas & Friends®, Dora the Explorer®, Mickey Mouse® Clubhouse, and Disney Jake and the Never Land Pirates® (collectively "Fisher-Price Friends"), and Power Wheels®.

> *American Girl Brands* – including Truly Me®, Girl of the Year®, BeForever®, Bitty Baby®, and WellieWishers™.   American Girl® Brands products are sold directly to consumers via its catalog, website, and proprietary retail stores, as well as sold directly to certain retailers.

*Construction and Arts & Crafts Brands* – including MEGA BLOKS® and RoseArt®.

26.     The majority of Mattel's products are sold to a relatively small retail customer base, with direct sales to retailers in the United States and Canada accounting for approximately one-half of Mattel's gross revenue.  During the fiscal year ended December 31, 2016, Mattel's three largest customers, Wal-Mart Stores, Inc., Toys "R" Us, Inc. and Target Corporation, collectively accounted for approximately 39% of its net revenue, and its ten largest customers accounted for approximately 49% of its total net sales.  In addition, the Company's business is highly seasonal in nature, with the majority of its retail sales occurring during the September through December timeframe.

27.     In the years just prior to the Class Period, Mattel underperformed its peers.  As an illustration, during 2013, Mattel generated an operating profit margin of 18%, or 300 basis points better than its closest peer, Hasbro, Inc. ("Hasbro").  Just two years later, however, Mattel's 2015 operating profit margin declined by nearly 50% to 9.5%.  This decline in the Company's operating profit margin largely resulted from deteriorating sales and gross margins, as well as higher promotional spending levels, as Mattel's products failed to resonate with consumers.

28.     Defendants Sinclair and Dickson took control of the Company's management in the spring of 2015 and embarked on an effort to turn the Company's business around.

29.     As detailed herein, at the start of the Class Period, Mattel announced its financial results for the quarter ended September 30, 2016 ("Q3 2016").  For Q3 2016, Mattel reported gross sales of $1.98 billion, in line with the prior-year period, and operating income of $317.4 million, approximately 6% better than the comparable prior-year period.

30.     Unbeknownst to investors, Mattel's favorable Q3 2016 results were the result of the Company's loading up its retail customers with excess product in advance

of the 2016 holiday selling season.  Thereafter, during the 2016 fourth quarter ("Q4 2016"), Mattel was forced to issue large amounts of so-called "sales adjustments," including trade discounts and other allowances, and boost promotional spending to help retailers clear bloated levels of Mattel inventory.  These sales adjustments had a material adverse effect on the Company's operating results during Q4 2016.  Indeed, the magnitude of the sales adjustments issued by Mattel during Q4 2016 is illustrated in the following chart:



31.     When defendants announced the Company's 2016 year-end results, they disclosed that Mattel's year-over-year worldwide net sales (gross sales after sales adjustments) for Q4 2016 ***declined by 8%***, its gross margins ***declined by 14%*** and its operating income ***declined by 11%*** due to extraordinary sales adjustments and promotional costs incurred by the Company during Q4 2016 to help clear the known, but undisclosed, massive pre-existing build-up of Mattel inventory in its retail channel.  Indeed, at the end of the Class Period, Steven Totzke, Mattel's Executive Vice President and Chief Commercial Officer, publicly stated that he receives "live feedback" on the state of Mattel's inventory level, thereby acknowledging that

1  defendants knew of the level of Mattel's products in the retail channel prior to and

2  during the Class Period.

3       32.   On January 25, 2017, when Mattel announced its Q4 2016 and year-end

4  results, defendants, as detailed herein, disclosed adverse facts associated with the

5  Company's inventory and the price of Mattel stock fell approximately ***18%***, or $5.57

6  per share, on heavy trading volume to close at $25.99 per share.

7       33.   Defendants, however, continued to mislead the market by downplaying

8  the significance of the amount of retail inventory existing at the end of Q4 2016.

9  Defendants misleadingly characterized the remaining retail inventory at the end of Q4

10  2016 as being "moderately," *i.e.*, not extremely or excessively, elevated, and told

11  investors that such inventory was within in "a manageable range."  Indeed, defendant

12  Sinclair told investors that Mattel had just a "little bit of inventory in some pockets" to

13  work through.

14       34.   After the market closed on April 20, 2017, Mattel announced its

15  operating results for the 2017 fiscal first quarter, the period ended March 31, 2017

16  ("Q1 2017").  The Q1 2017 results were significantly less than Wall Street securities

17  analysts' consensus estimates due to a "retail inventory overhang coming out of the

18  holiday period."   In fact, Mattel's newly appointed CEO, Margaret Georgiadis

19  ("Georgiadis"), who succeeded defendant Sinclair, noted that retail inventory levels

20  during Q1 2017 were such that they had a "prolonged impact" on customer reorders.

21       35.   In response to these revelations, the price of Mattel stock fell

22  approximately ***14%***, or $3.42 per share, on heavy trading volume to close at $21.79

23  per share on April 21, 2017.

24       36.   Indeed, at the beginning of the Class Period, securities analysts tried to

25  gauge the extent to which Mattel's retail channel was supplied with inventory by

26  questioning defendants about product shipments to retailers and retailer point-of-sale

27  ("POS") data, as a comparison of these metrics would help investors discern whether

28

Mattel inventory in its retail channel was increasing, decreasing or remaining constant.

37.   In response to such inquires, defendants falsely represented that Mattel's shipments to retailers and retailer POS data were balanced, or "aligned," which created the illusion that Mattel's inventory in the retail channel was not increasing.

38.   In truth, however, retailers were bloated with Mattel's products, as shipments of the Company's goods to retailers far exceeded retailer POS data.  Unable to gauge the extent to which retailers were supplied with inventory, investors could not discern the true risk that Mattel would have to issue its customers sales adjustments or other financial concessions to help them clear bloated inventory levels, or the extent to which such inventory levels would adversely affect the Company's future sales growth.

## MATERIALLY FALSE AND MISLEADING STATEMENTS ISSUED DURING THE CLASS PERIOD

39.   The Class Period begins on October 20, 2016.  After the market closed on October 19, 2016, Mattel issued a press release announcing its Q3 2016 financial results.  For the quarter, Mattel reported that its worldwide net sales were up 2% year-over-year, on a constant currency basis, and its operating income had increased 5.5% over the comparable prior-year period.  Defendant Sinclair commented on Mattel's Q3 2016 financial results and Q4 2016 outlook, stating, in pertinent part, as follows:[1]

> "In the third quarter, *we continued to make solid progress against our strategic priorities*, and we are pleased with our momentum as we head into the holiday season . . . .  Our core brands continue to show improved strength and vibrancy, contributing to very encouraging and broad-based top-line momentum.  And we continued to manage costs effectively, while making important investments in brand building, commercial excellence and emerging market expansion.  Overall, our

---

[1]   Unless otherwise noted herein, emphasis is added throughout.

strategies are generating good progress on many fronts, and while we still have a critical fourth quarter to execute, ***we remain broadly on track to deliver on our full-year outlook***."

40.    Later that evening, Mattel held a conference call with securities analysts and investors to discuss Mattel's Q3 2016 operating results.  During the conference call, defendant Sinclair suggested normal inventory levels existed in the Company's retail channel, announcing that "consumer takeaway [was] aligning nicely with shipping," and stated, in pertinent part, as follows:

So let me begin by saying that in the quarter, we continued to make some very good progress across all of our strategic priorities.  ***We were especially encouraged by the momentum of our top line where our positive consumer takeaway [sales] is aligning nicely with [Mattel's] shipping***.  This increases our confidence as we get set for the holiday season and as we look to deliver on our challenging 2016 top-line objectives.

41.    During the conference call, defendant Dickson then reinforced the notion that inventory in the retail channel was at ordinary levels by stating that Mattel's gross sales, *i.e.*, customer product shipments, were "aligned" with retail POS data, stating, in pertinent part, as follows:

As you know, ***POS is the true barometer of a brand's success*** with shipping ultimately aligning to it over time.  And our turnaround efforts focusing on consumer demand creation and better global commercial alignment are clearly gaining traction.

Excluding the impact of Disney Princess, global POS continues to be up mid-single digits for the quarter and year to date with solid results across the majority of our brands.  ***And gross sales, excluding Disney Princess, are aligned to POS*** with sales in constant currency up low-double digits for the quarter and up high-single digits year to date.

42.     Similarly, during the conference call, defendant Farr stated that product shipping during Q3 2016 was "better aligned" with positive retail POS, helping to position the Company to execute and deliver its financial objectives during Q4 2016, stating, in pertinent part, as follows:

> Thank you, Richard, and good afternoon, everyone.  Overall, our third-quarter results met expectations with ***shipping better aligned with positive POS***, which positions us well to execute the fourth quarter and deliver our challenging top-line objectives for the year.  We continue to focus on managing the P&L, leveraging sales and POS momentum, and cost savings initiatives to help offset continued ForEx headwinds and short-term mix challenges.

43.     Concerning Mattel's outlook, defendant Farr stated that "we don't see any significant changes to our full-year 2016 outlook," noting, in pertinent part, as follows:

> Looking ahead as Chris said, as we enter the fourth quarter, ***we don't see any significant changes to our full-year 2016 outlook***.  We have a lot of work to do to execute the fourth quarter and our focus remains on delivering operating profit by balancing our top-line and managing the middle of the P&L.  As expected, the unfavorable impact of ForEx did lessen in the third quarter, which we believe will continue.
>
> And given our third-quarter results, our revenue outlook has not changed.  We've gained confidence with our results to date and believe we are well positioned to meet our challenging 2016 revenue objective of relatively flat net sales in constant currency.
>
> At the same time, ***we will work hard to achieve a full-year gross margin of about 48.5%***.  This continues to be an important area of focus as we still face ForEx and mix headwinds but we do expect to be in the range of this target.  ***It means that we need to achieve a fourth-quarter***

*gross margin rate around 51%, which is a challenge, but well within the ranges we have achieved in the past. The sequential improvement in gross margin is supported by incremental volume, improved mix from stronger trends in our girls properties* with American Girl, Barbie, and DC Superhero Girls, a smaller Disney Princess impact, and by incremental flow-through from our supply chain and other cost savings initiatives.

44.     During the conference call's Q&A session, defendant Farr reiterated defendants' confidence in Mattel's ability to achieve its 2016 gross margin objective of 48.5%. The following exchange, in pertinent part, transpired:

[Felicia Hendrix – Barclays Capital – Analyst:] Okay, thank you. *So just sticking on the topic of gross margins*, and Kevin, you kind of gave color and we could have backed into what you need to be for the fourth quarter and you kind of highlighted that it's challenging. But just given all of the inputs, the puts and takes to get to that number *for the fourth quarter* taking into consideration there's challenging [sic], I was just wondering how comfortable are you with your full-year gross margin outlook, like *what could go wrong*[?].

[Defendant Farr:]  Yes, I think with regard to we don't control things like ForEx [sic], and there's a lot of moving pieces like mix but when we look at it *we feel pretty confident with regard to the 48.5% target*, and we're working hard to achieve that and it's difficult to predict but we are working on a lot of the moving pieces including ForEx, mix, and incremental revenues, and we also expect to improve mix from our girls properties, American Girl, Barbie, and Disney or DC Superheroes. There is going to be a smaller impact from Disney Princess, and then we do see incremental flow through from our supply chain and other cost savings initiatives.

45. Following these positive statements, the price of Mattel stock rose $1.84 per share, or more than 6%, to close at $32.46 per share on October 20, 2016, on heavy trading volume.

46. On October 27, 2016, Mattel filed with the SEC its Form 10-Q for the quarter ended September 30, 2016 (the "Q3 Form 10-Q"), which was signed by defendant Johnson.

47. The Q3 Form 10-Q falsely represented that "[t]here have been no material changes to the risk factors disclosed under Part I, Item 1A 'Risk Factors' in Mattel's 2015 Annual Report on Form 10-K." This representation was materially false and misleading as the Q3 Form 10-Q failed to disclose the heighten financial risk associated with bloated retailer inventory levels, including the risk that Mattel may have to incur incremental costs to clear such inventory and the extent to which such inventory levels would adversely impact Mattel's future sales growth.

48. In addition, the Q3 Form 10-Q falsely and misleadingly represented that Mattel's disclosure controls were operating effectively when they were not, stating, in pertinent part, as follows:

> As of September 30, 2016, Mattel's disclosure controls and procedures were evaluated, with the participation of Mattel's principal executive officer and principal financial officer, to assess whether they are effective in providing reasonable assurance that information required to be disclosed by Mattel in the reports that it files or submits under the Securities Exchange Act of 1934 is accumulated and communicated to management, including its principal executive officer and principal financial officer, as appropriate, to allow timely decisions regarding required disclosure and to provide reasonable assurance that such information is recorded, processed, summarized, and reported within the time periods specified in Securities and Exchange Commission rules and forms. The scope of Mattel's assessment of the effectiveness of its

disclosure controls and procedures does not include any disclosure controls and procedures of Fuhu or Sproutling, which were acquired in January 2016, that are also part of Fuhu and Sproutling's internal controls over financial reporting. This exclusion is in accordance with the SEC's general guidance that a recently acquired business may be omitted from the scope of the assessment in the year of acquisition. Based on this evaluation,  Christopher A. Sinclair, Mattel's principal executive officer, and Kevin M. Farr, Mattel's principal financial officer, concluded that these disclosure controls and procedures were effective as of September 30, 2016.

49.    The Q3 Form 10-Q also contained false and misleading certifications by defendants Sinclair and Farr on Mattel's disclosure controls and procedures, stating, in pertinent part, as follows:

I, [defendant Sinclair/defendant Farr], certify that:

1.    I have reviewed this quarterly report on Form 10-Q of Mattel, Inc.;

2.    Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.    Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.    The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal

control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

(a)    Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

(b)    Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

(c)    Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(d)    Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.    The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the

registrant's board of directors (or persons performing the equivalent functions):

(a)    All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

(b)    Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

50.    The above-referenced false and misleading statements, omissions and certifications in the Q3 Form 10-Q were falsely and misleadingly repeated, in all material respects, in the Form 10-K that Mattel filed with the SEC later in the Class Period.

51.    On November 3, 2016, defendants held Mattel's 2016 Analyst Day with investors and securities analysts ("Analyst Day").  During the Analyst Day, defendant Sinclair expressed confidence in the Company's ability to drive "sustainable profitable growth," in part, due to its improving and growing shipping performance and retailer POS, stating, in pertinent part, as follows:

> [T]oday's Mattel is confident, aligned and focused on driving sustainable profitable growth and on building value for our shareholders.
>
> From our efforts to transform this company, a new foundation has been set.  And I think it's fair to say that Mattel's strategy to reenergize its creative culture and to align its global commercial organization around refocused brand management and revitalized strategic partnerships is working.  And it's showing up in our results.
>
> Our POS and shipping are significantly improved and growing. Our core brands are building strength.  Our Toy Box is accelerating led

by a vibrant slate of entertainment properties.  We're increasing our space, merchandising and support with many of our key retail and online customers.

We're also driving excellent growth in big emerging markets like China and Russia.  And we've significantly improved our cost structure.

And finally, we're effectively managing our P&L and balance sheet as we reinvest in growth, compensate for significant headwinds and foreign exchange [and] the loss of Disney Princess and support our dividend.  Because of this momentum and of the foundation that we're building, ***I can say with a degree of confidence that we're poised for much more improved growth and a better outlook in '17 and beyond***.

***Over the balance of this morning,  I hope that we can impart some of that same sense of confidence in all of you***.

52.   Defendant Sinclair later highlighted the power of Mattel's brand portfolio to offset any revenue lost from the 2015 expiration of the Company's global rights to produce and sell toys based on Disney Princess® characters, stating, in pertinent part, as follows:

Consider the fact that despite the loss of Disney Princess, ***we're clearly on track to fully offset that shortfall by the end of this year***.  To put that in perspective, that's essentially like creating a top 10 toy company in just one year's time.  A true testament to the power and diversity of our brand portfolio and of our ability to execute effectively as a company.

53.   In addition, defendant Dickson stated that Mattel's relationships with its retail partners were creating "great in-store executions," as validated by "positive and improving POS results," stating, in pertinent part, as follows:

- 18 -

We have made significant strides in our relationships with our retail partners, which are not only resulting in increased shelf space but also allowing us to create great in-store executions.

*Our positive and improving POS results are proof that this is working.  And we're taking in-store execution to a whole other level* with our new American Girl shop within a shop here at Toys "R" Us and we'll look to use that model to build the bigger presence with our other brands in the near future.

54.    Defendant Farr also made materially false and misleading statements about the Company's operations.  First, defendant Farr stated that, based, in part, on "strategic pricing" and other initiatives, Mattel was on track to deliver an approximate 48.5% gross margin for 2016, stating, in pertinent part, as follows:

And as expected, gross margin was down in the third quarter primarily due to currency and mix, but these headwinds are being partially offset by significant cost savings, and while we expect foreign exchange to continue to lessen in the fourth quarter as it did in the third and mix to improve slightly.

*In the fourth quarter, we continue to rely on strategic pricing*, cost savings and supply chain *initiatives* to partially offset the impact of forex and mix.  Despite these headwinds, *we remain on track to deliver a gross margin of about 48.5% for the full year*.

55.    Defendant Farr then stated defendants expected to see improvements in the Company's 2017 gross margins, as Mattel "grow[s] significantly in 2017," stating, in pertinent part, as follows:

However, we do plan on seeing year-over-year improvement in gross margin percentages despite potential challenges with mix.

We expect gross margins to improve in 2017 versus 2016 due to improved scale relative to our fixed supply chain cost base as we grow

significantly in 2017, a stronger performance by our girls portfolio driven by Barbie, American Girl, and DC Superhero Girls, and improving margin structure for MEGA, as we invest in manufacturing and gain scale.  And the opportunity to strategically price our portfolio particularly in international markets where currencies have weakened significantly over the past couple of years.

56.     In addition, defendant Farr stressed that efficiencies in sales adjustments, *i.e.*, trade discounts and other allowances, inventory management and advertising spending would improve operating margins, stating, in pertinent part, as follows:

Turning to our P&L levers to improve operating margins for 2017, we should continue to be efficient in our sales adjustments, which we are targeting to be in our historical range of 9% to 9.5%.  With growing revenues, we'll be building out a better retail fulfillment strategy to optimize retail inventory positions and our owned inventory positions.

Better demand planning and sourcing systems would help ensure that the right inventory is in the right place at the right time, which should improve the efficiency of our sales adjustments.  And we expect foreign exchange to be less of a headwind in 2017, but our path to get back to gross margins of around 50% will likely extend beyond 2017.

*        *        *

***Like sales adjustments, we should continue to be efficient in our advertising*** and look to target spending on the lower end of our historical range of 11% to 13%.

As I mentioned, we have a very strong entertainment lineup in 2017 so we'll not need to spend as much on advertising those licenses compared to our owned I.P.

57.     During the Analyst Day Q&A session, defendant Dickson issued positive statements about Q4 2016 and retail POS data for the Company's all important Barbie brand, stating, in pertinent part, as follows:

[Unidentified Audience Member:]  Can you comment on Barbie POS trends in the fourth quarter so far?

[Defendant Dickson:]  Well, ***so far so good.  We've been quite pleased with Barbie's trend throughout the year*** for those tracking along which is a good group to say that to. . . .  [T]he U.S. started out, I think, with a lot more momentum than the rest of the world as we indicated the rest of the world was catching up to all the marketing plans and some of the rollouts of the specific new refreshed product and as we've seen the rest of the world get traction overall, ***now we're really quite pleased with Barbie's POS performance***.

We are heading into what was, last year, a very good POS here for Barbie and so we are lapping and planning to lap a pretty aggressive POS season.  That being said, as you see and feel, ***we've got momentum behind the brand***.  We've got renewed purpose around how we market the brand and how we speak to the brand, not only to consumers, but we've got retailer confidence, we've got increased shelf space.

We've implemented, if you will, media strategies surgically around the balance between traditional TV and digital.

58.     The statements referenced in ¶¶39-44, 47-49 and 51-57 above were materially false and misleading when made because they misrepresented and failed to disclose the following adverse facts, which were known to defendants or recklessly disregarded by them:

(a)     prior to and during the Class Period, Mattel's retail customers were loaded with extremely high levels of unsold Mattel product;

(b)     as a result of Mattel's unusually high levels of unsold inventory at its retailers, Mattel was exposed to the heightened risk that it would have to issue its retailers financial concessions (in the form of sales adjustments, discounts and promotions) to remove such excess inventory, as well as the heightened risk that Mattel would experience slower sales growth in future periods;

(c)     the representations in Mattel's Q3 Form 10-Q about its risk factors and disclosure controls were materially false and misleading; and

(d)     as a result of the foregoing, defendants lacked a reasonable basis for their positive statements about Mattel's then-current business and future financial prospects.

59.     On January 25, 2017, Mattel issued a press release announcing its Q4 2016 and year-end financial results for the period ending December 31, 2016.

60.     For Q4 2016, the Company reported that, on a year-over-basis, worldwide net sales *declined by 8%* to $1.83 billion, gross margins *declined by 14%* to 47.0% and operating income *declined by 11%* to $262.6 million.

61.     Later that day, Mattel held a conference call with analysts and investors ("Q4 conference call") to discuss Mattel's Q4 2016 and year-end financial results. During the Q4 conference call, defendant Sinclair stated that Mattel's gross margins were "significantly impacted by elevated sales adjustments and by heavier discounting," which, in turn, had adversely impacted the cash generated by Mattel's operations.  Defendants also acknowledged that high levels of sales adjustments and discounting were necessary to liquidate excess inventory in the retail channel.

62.     In response to these revelations, the price of Mattel stock fell approximately *18%*, or $5.57 per share, on heavy trading volume to close at $25.99 per share on January 26, 2017.

63.     Defendants, however, continued to mislead investors. First, defendant Sinclair misleadingly attributed the Company's worse than expected Q4 2016 operating performance to "industry-wide challenges," including a significant

slowdown in the U.S. toy category for the holiday period, stating in the press release, in pertinent part, as follows:

> "Our results were negatively impacted by a number of industry-wide challenges, including a significant U.S. toy category slowdown in the holiday period, and increased forex headwinds . . . .  And while our sales at retail remained strong, the slowdown triggered elevated retail promotional activity and decreased shipping, all of which had a significant impact on our gross margin."

> . . . "Even against this difficult backdrop, our core brands continued to show solid growth, and our performance in key emerging markets like China was equally strong.  And, importantly, we offset a substantial revenue gap from the loss of the Disney Princess license.  Looking forward, we remain broadly optimistic about Mattel's performance in 2017 and beyond.  Our core brands are strong and growing, we have a solid lineup of entertainment properties in the pipeline, and we are forging valuable relationships with key retail partners throughout the world."

64.     As illustrated in the following chart, however, defendant Sinclair's "industry-wide" pretext for Mattel's Q4 2016 performance is belied by the 2016 fourth quarter financial results reported by Hasbro, Mattel's closest peer:

**Mattel Inc. and Hasbro Inc.**
Reported Key Financial Metrics
2016 Fourth Quarter

|                  | Mattel  | Hasbro  |
| ---------------- | ------- | ------- |
| Net Sales        | -8.27%  | 11.23%  |
| Gross Profit     | -14.16% | 8.13%   |
| Operating Income | -10.71% | -1.35%  |

1    65.    Significantly, defendants continued to mislead the market by

2  downplaying the continuing risks associated with Mattel's existing retail inventory

3  levels at the end of Q4 2016.

4    66.    On the Q4 conference call, defendants characterized retail inventory

5  levels as being "moderately," *i.e.*, not extremely or excessively, elevated, and

6  explained that such inventory was within "a manageable range."

7    67.    During the Q&A session, defendants were questioned about the financial

8  impact of the lingering excess inventory on Mattel's operating performance in the

9  short run, which defendants Sinclair and Farr misleadingly downplayed, stating that

10  the inventory levels were at a "balancing point" and that excess inventory would be

11  "quickly" eliminated.  The following exchange, in pertinent part, transpired:

12      [Greg Badishkanian – Citi – Analyst:] So, do you think you'll end

13      Q1 with normalized inventory levels?  And then, how much do you think

14      the accelerated sales adjustments in Q1, how much will that impact Q1,

15      if at all?  And if you think that will continue into second quarter,

16      assuming you have too high inventories entering into the second quarter?

17      So, when will this kind of discontinue, in terms of the promotions,

18      discounts, et cetera?

19      [Defendant Sinclair:]  Greg, I think ***I would expect we'd be in***

20      ***pretty decent shape on inventory as we get through the first quarter,***

21      ***and it's really in pockets.  So, this is not a horrendous issue at this***

22      ***point***.

23      But as far as the allowances and discounting, I think we expect

24      that to kind of be back to normalized levels at this point.  And remember,

25      a lot of that is actually being used not for pure discounting; it was to help

26      accelerate some shipments.  And so, I think that's sort of reached sort of

27      a balance point with the major retailers.  And I'd say most of them are

28

1   fairly comfortable with where they're at right now, and the exit POS

2   certainly helped everybody.

3       [Defendant Farr:]  And I'd just like to add on.  Sales were below

4   expectations, but our owned inventory is of good quality.  We've got

5   mostly good brand POS momentum exiting the year.  ***And we'll work***

6   ***through the extra inventory quickly***, and I don't think we have to

7   discount it.

8       68.   Defendant Farr noted further that "the moderately high level of year-end

9   retail inventories will likely reduce our revenues in the first quarter and have less than

10  a 2% impact for the full year of 2017."  When a securities analyst sought additional

11  clarification on this comment, defendant Sinclair deceptively stated, in pertinent part,

12  that "we do have to work off a little bit of inventory in some pockets":

13      [Tim Conder – Wells Fargo Securities – Analyst:]  Just to follow

14  on a little bit on the prior question here.  I think you had said previously

15  regarding 2017 top line outlook – and granted, Chris, what you just said,

16  that the base bar has been lowered here – but I think previously you had

17  said somewhere up between mid- and high-single digits.  And then,

18  Kevin, in your comment you said you see 2017 being impacted less than

19  2% for a full year.

20      So, was that reference point up mid- to high-single digits for year-

21  over-year growth and now you're saying that range comes off less than

22  2%?  Is that the proper way we should hear what you're saying?

23      [Defendant Sinclair:]  I think that's probably a fair way to look at

24  it, Tim.  We're still confident that we're somewhere in the mid to the up-

25  middle range of growth.  ***But we do have to work off a little bit of***

26  ***inventory in some pockets***.  That's probably more of a first quarter issue,

27  but obviously it affects full year.

28

- 25 -

69.     On January 30, 2017, Moody's put Mattel's credit on review for downgrade citing discounting at retail that contributed to narrowed profit margins and lower cash flow.

70.     On February 17, 2017, Mattel held its Toy Fair conference call with securities analysts and investors.  During the conference call, defendant Farr falsely and misleadingly stated that "[w]e expect first quarter revenues to be done [sic] [down] mid to high single digits as a result of the elevated retail inventory at year-end 2016," and that first quarter gross margin would also be down "moderately" due to the foreign exchange headwinds and some targeted inventory cleanup.

71.     Also during the Toy Fair presentation, Steven Totzke, Mattel's Executive Vice President and Chief Commercial Officer, represented to investors that he receives "live feedback" on the state of Mattel's inventory, stating, in pertinent part, "I get a lot of **live feedback** on the state of our space, and our product placement and **our inventory levels**."

72.     On February 21, 2017, Mattel held the Q&A session of the Toy Fair conference call with securities analysts and investors.  During the conference call, defendant Sinclair acknowledged that Mattel loaded up the retail channel in advance of Q4 2016 based upon "a pretty positive set of plans" for the quarter and later engaged in "discounting to support shipping and tried to move product off of retail," stating, in pertinent part as follows:

> Let me begin by sort of once again saying that, clearly, we had a difficult fourth quarter and we are disappointed with the results, which we found to be more difficult than anticipated.  Essentially, **what we had done is we had built a pretty positive set of plans for the fourth quarter based on the assumption that we would maintain the strong momentum we had in POS leading into the fourth quarter**.

*       *       *

***We obviously got into discounting to support shipping and tried to move product off of retail***.  At the same time that that was occurring, we faced another fairly big headwind, which was some of our international currencies.  Particularly, the euro and the Mexican peso deteriorated fairly significant starting in November after the US election.  So we kind of faced a perfect storm, if you will.  We had two things coming together.  And obviously, the fourth quarter was not what we anticipated.

But I said again on Friday, look, we own the results. We think we made the right decisions at the time to try to get our shipments in and try to get product moving at retail.  But clearly, it cost us financially. So net, not where we expected to be or wanted to be in the quarter.

73.    Then, in response to an analyst's question on the state of the Company's business in Europe, defendant Sinclair falsely and misleadingly represented that in Europe, Mattel was "in reasonably good shape" and "fairly healthy in terms of inventory."  The following exchange, in pertinent part, transpired:

[Linda Bolton Weiser - B. Riley & Co. – Analyst:]  Thank you. So when you reported the fourth-quarter results, there was a lot of discussion around the significant increase in sales adjustments in North America.  But when you really look at the results, the adjustment in North America was only about 2%, but it was actually quite a bit larger **in Europe** and Latin America.  So**, *could you give us a little bit of state of the union kind of on those regional markets*** and how you ended the year and also, on a longer-term basis, where you think the opportunities are and how you are competitively in those markets?

[Defendant Sinclair:]  I'll take a shot at that one, Linda.  Your assessments are completely accurate.  The issues started here in North America with a slowdown, and that's where we sort of first responded.

1    But it was almost simultaneous.  We saw the same trends in Europe, and
2    even Latin America showed some softening as well as Australia.

3        I'd say we were probably better positioned here in the US, frankly,
4    as we got into trying to get product into the stores and discounting, than
5    we were in Europe.  Europe, because Disney Princess was a much bigger
6    factor, frankly, we probably had less in our arsenal (technical difficulty)
7    work with.   So I think we scrambled across the board.   It was a
8    combination of Europe, North America, and parts of Latin America
9    where the sales get elevated discounting.

10      ***On  balance,  though,  I  think  we  came  out  in  Europe  in***
11    ***reasonably good shape.  Our trends were good. Our business there is***
12    ***fairly healthy in terms of inventory***.

13    74.   On February 23, 2017, Mattel filed with the SEC its Form 10-K for the
14  year ended December 31, 2016 (the "Form 10-K"), which was signed by defendants
15  Sinclair, Farr and Johnson.   The Form 10-K contained false and misleading
16  disclosures regarding risk factors and disclosure control procedures, as well as
17  defendant Farr's certification thereon.  *See* ¶¶47-50 *supra*.

18    75.   The statements referenced in ¶¶59-61, 63-68 and 70-74 above were
19  materially false and misleading when made because they misrepresented and failed to
20  disclose the following adverse facts, which were known to defendants or recklessly
21  disregarded by them:

22    (a)   Mattel was experiencing prolonged, adverse financial effects from
23  the existing overhang of unusually high levels of unsold retailer inventory during Q1
24  2017, including reduced orders by retailers;

25    (b)   Q1 2017 North American and European sales, in particular, were
26  experiencing sales shortfalls;

27    (c)   the representations in Mattel's Form 10-K about its risk factors and
28  disclosure controls were materially false and misleading;

(d)     the certification issued by defendant Farr associated with Mattel's disclosure controls was materially false and misleading; and

(e)     as a result of the foregoing, defendants lacked a reasonable basis for their positive statements about Mattel's then-current business and future financial prospects.

76.     On April 20, 2017, after the close of the market, Mattel issued a press release announcing its Q1 2017 financial results, the period ending March 31, 2017.

77.     For the quarter, the Company reported that, on a year-over-year basis, worldwide net sales and gross margins each ***declined by more than 15%***, and its operating loss increased by ***more than 158%*** to $127.0 million from $49.1 million.

78.     Mattel's Q1 2017 results took securities analysts by surprise and were significantly below Wall Street consensus estimates.  In fact, Mattel's 15% net sales decline during the quarter was ***twice*** the 7.8% decline expected by Wall Street analysts and its reported Q1 2017 gross margins were ***520 basis points less*** than expected Wall Street consensus estimates.  Moreover, Mattel's revenue decline during Q1 2017 was well above the "mid to high single digit[]" decline propounded by defendant Farr at Mattel's Toy Fair on February 17, 2017, when Q1 2017 was more than half complete.

79.     Mattel's newly appointed CEO, Georgiadis, commented on the Q1 2017 results, stating, in pertinent part, as follows:

> "***Our Q1 results were below our expectations due to the retail inventory overhang coming out of the holiday period***, but we remain encouraged by strong performance at retail for our key core brands, including Barbie, Hot Wheels and Fisher-Price as well as sustained momentum in high-growth markets like China . . . .  We are confident we have worked through the majority of this overhang and look forward to a strong launch of Disney's Cars 3 theatrical release in the second quarter. While we have a lot of work to do to successfully position Mattel for the

1  future, we see a clear runway to improving growth and profitability over

2  time."

3      80.    After the issuance of the Q1 2017 earnings release, Mattel held a

4  conference call with securities analysts and investors.  During the conference call,

5  defendant Farr stated, in pertinent part, that "[w]hat we didn't expect was *the*

6  *prolonged impact from the retail inventory overhang and the resulting slower pace*

7  *of reorders by retailers*, **with sales in North America and Europe particularly**

8  **impacted**."

9      81.    In response to these revelations, the price of Mattel stock fell nearly *14%*,

10  or $3.42 per share, on heavy trading volume to close at $21.79 per share on April 21,

11  2017.

12     82.    The market for Mattel securities was open, well developed and efficient

13  at all relevant times.  As a result of these materially false and misleading statements

14  and failures to disclose, Mattel securities traded at artificially inflated prices during

15  the Class Period.  Plaintiff and other members of the Class purchased Mattel securities

16  relying upon the integrity of the market prices of Mattel securities and market

17  information relating to Mattel, and have been damaged thereby.

18     83.    During the Class Period, defendants materially misled the investing

19  public, thereby inflating the prices of Mattel securities, by publicly issuing false and

20  misleading statements and omitting to disclose material facts necessary to make

21  defendants' statements, as set forth herein, not false and misleading.  Said statements

22  and omissions were materially false and misleading in that they failed to disclose

23  material adverse information and misrepresented the truth about the Company, its

24  business and operations, as alleged herein.

25     84.    At all relevant times, the material misrepresentations and omissions

26  particularized in this complaint directly or proximately caused, or were a substantial

27  contributing cause of, the damages sustained by plaintiff and other members of the

28  Class.  As described herein, during the Class Period, defendants made or caused to be

1  made a series of materially false or misleading statements about Mattel's business,

2  products and operations.  These material misstatements and omissions had the cause

3  and effect of creating in the market an unrealistically positive assessment of Mattel

4  and its business, products and operations, thus causing the Company's securities to be

5  overvalued and artificially inflated at all relevant times.  Defendants' materially false

6  and misleading statements during the Class Period resulted in plaintiff and other

7  members of the Class purchasing the Company's securities at artificially inflated

8  prices, thus causing the damages complained of herein.

9  <center>**ADDITIONAL SCIENTER ALLEGATIONS**</center>

10  85.   As alleged herein, defendants acted with scienter in that they knew that

11  the public documents and statements issued or disseminated in the name of the

12  Company were materially false and misleading; knew that such statements or

13  documents would be issued or disseminated to the investing public; and knowingly

14  and substantially participated or acquiesced in the issuance or dissemination of such

15  statements or documents as primary violations of the federal securities laws.

16  Defendants, by virtue of their receipt of information reflecting the true facts regarding

17  Mattel, their control over, and/or receipt and/or modification of Mattel's allegedly

18  materially misleading misstatements and/or their associations with the Company

19  which made them privy to confidential proprietary information concerning Mattel,

20  participated in the fraudulent scheme alleged herein.

21  86.   The fraudulent scheme described herein could not have been perpetrated

22  during the Class Period without the knowledge and complicity of, or at least the

23  reckless disregard by, personnel at the highest levels of the Company, including the

24  Individual Defendants.   Given their executive-level positions with Mattel, the

25  Individual Defendants controlled the contents of Mattel's public statements during the

26  Class Period.  The Individual Defendants were each provided with or had access to the

27  information alleged herein to be false and/or misleading prior to or shortly after their

28  issuance and had the ability and opportunity to prevent their issuance or cause them to

1   be corrected.    Because of their positions and access to material non-public

2   information, the Individual Defendants knew or recklessly disregarded that the

3   adverse facts specified herein had not been disclosed to and were being concealed

4   from the public and that the positive representations that were being made were false

5   and misleading.  As a result, each of the defendants was responsible for the accuracy

6   of Mattel's corporate statements and is, therefore, responsible and liable for the

7   representations contained therein.

8        87.    Indeed, during the Class Period, Steven Totzke, Mattel's Executive Vice

9   President and Chief Commercial Officer, represented to investors that he receives

10   "live feedback" on the state of Mattel's inventory.

11       88.    Plaintiff also alleges that the scienter of the Individual Defendants who,

12   as executive officers of the Company, knew or recklessly ignored facts related to the

13   core operations of Mattel, can be imputed to Mattel.

14       89.    In addition, the scienter of the defendants is underscored by the Sarbanes-

15   Oxley mandated certifications of defendants Sinclair and Farr, which acknowledged

16   their responsibility to investors for establishing and maintaining controls to ensure that

17   material information about Mattel was made known to them and that the Company's

18   disclosure-related controls were operating effectively.

19                              **LOSS CAUSATION**

20       90.    During the Class Period, as detailed herein, defendants engaged in a

21   scheme to deceive the market and a course of conduct that artificially inflated the

22   prices of Mattel securities and operated as a fraud or deceit on Class Period purchasers

23   of Mattel securities by failing to disclose and misrepresenting the adverse facts

24   detailed herein.  As defendants' prior misrepresentations and fraudulent conduct were

25   disclosed and became apparent to the market, the price of Mattel securities declined

26   significantly as the prior artificial inflation came out of the price of the Company's

27   securities.

28

91.     As a result of their purchases of Mattel securities during the Class Period, plaintiff and the other Class members suffered economic loss, *i.e.*, damages, under the federal securities laws.  Defendants' false and misleading statements had their intended effect and caused Mattel securities to trade at artificially inflated levels throughout the Class Period, with Mattel's stock price reaching a high of $33.09 per share on October 21, 2016.

92.     By concealing from investors the adverse facts detailed herein, defendants presented a misleading picture of Mattel's business, products and operations.  When the truth about the Company was revealed to the market, the price of Mattel securities fell significantly.  The price declines removed the inflation from the price of Mattel securities, causing real economic loss to investors who had purchased Mattel securities during the Class Period.

93.     The declines in the price of Mattel securities after the corrective disclosures came to light were the direct result of the nature and extent of defendants' fraudulent misrepresentations being revealed to investors and the market.  The timing and magnitude of the price declines in Mattel securities negate any inference that the losses suffered by plaintiff and the other Class members were caused by changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to defendants' fraudulent conduct.

94.     The economic loss, *i.e.*, damages, suffered by plaintiff and the other Class members was a direct result of defendants' fraudulent scheme to artificially inflate the prices of Mattel securities and the subsequent significant decline in the value of Mattel securities when defendants' prior misrepresentations and other fraudulent conduct were revealed.

**APPLICABILITY OF PRESUMPTION OF RELIANCE:
FRAUD ON THE MARKET DOCTRINE**

95.     At all relevant times, the market for Mattel securities was an efficient market for the following reasons, among others:

1            (a)     Mattel common stock met the requirements for listing and was

2 listed and actively traded on the NYSE, a highly efficient stock market;

3            (b)     as a regulated issuer, Mattel filed periodic public reports with the

4 SEC and the NYSE;

5            (c)     Mattel regularly communicated with public investors via

6 established market communication mechanisms, including the regular dissemination

7 of press releases on the national circuits of major newswire services and other wide-

8 ranging public disclosures, such as communications with the financial press and other

9 similar reporting services; and

10            (d)     Mattel was followed by securities analysts employed by major

11 brokerage firms who wrote reports that were distributed to the sales force and certain

12 customers of their respective brokerage firms.  Each of these reports was publicly

13 available and entered the public marketplace.

14       96.     As a result of the foregoing, the market for Mattel securities promptly

15 digested current information regarding Mattel from all publicly available sources and

16 reflected such information in the prices of the securities.  Under these circumstances,

17 all purchasers of Mattel securities during the Class Period suffered similar injury

18 through their purchase of Mattel securities at artificially inflated prices and a

19 presumption of reliance applies.

20 <div align="center">**COUNT I**</div>

21 <div align="center">**Violation of §10(b) of the Exchange Act**</div>
<div align="center">**and Rule 10b-5 Promulgated Thereunder**</div>

22 <div align="center">**Against All Defendants**</div>

23       97.     Plaintiff repeats and realleges each and every allegation contained above

24 as if fully set forth herein.

25       98.     During the Class Period, defendants disseminated or approved the

26 materially false and misleading statements specified above, which they knew, or

27 deliberately disregarded, were misleading in that they contained misrepresentations

28

1  and failed to disclose material facts necessary in order to make the statements made,
2  in light of the circumstances under which they were made, not misleading.

3      99.   Defendants: (a) employed devices, schemes and artifices to defraud;
4  (b) made untrue statements of material fact and/or omitted to state material facts
5  necessary to make the statements not misleading; and (c) engaged in acts, practices
6  and a course of business that operated as a fraud and deceit upon the purchasers of the
7  Company's securities during the Class Period.

8      100.   Plaintiff and the Class have suffered damages in that, in reliance on the
9  integrity of the market, they paid artificially inflated prices for Mattel securities.
10  Plaintiff and the Class would not have purchased Mattel securities at the prices they
11  paid, or at all, if they had been aware that the market prices had been artificially and
12  falsely inflated by defendants' misleading statements.

13      101.   As a direct and proximate result of these defendants' wrongful conduct,
14  plaintiff and the other members of the Class suffered damages in connection with their
15  purchases of Mattel securities during the Class Period.

16                          **COUNT II**

17          **Violation of §20(a) of the Exchange Act**
                  **Against All Defendants**
18

19      102.   Plaintiff repeats and realleges each and every allegation contained above
    as if fully set forth herein.
20

21      103.   The Individual Defendants acted as controlling persons of Mattel within
22  the meaning of §20(a) of the Exchange Act as alleged herein.  By reason of their
23  positions as officers and/or directors of Mattel, and their ownership of Mattel stock,
    the Individual Defendants had the power and authority to cause Mattel to engage in
24
    the wrongful conduct complained of herein.   Mattel controlled the Individual
25
    Defendants and each of its employees.
26

27      104.   By reason of such conduct, defendants are liable pursuant to §20(a) of the
28  Exchange Act.

**PRAYER FOR RELIEF**

WHEREFORE, plaintiff prays for relief and judgment, as follows:

A.     Determining that this action is a proper class action, designating plaintiff as Lead Plaintiff and certifying plaintiff as a Class representative under Rule 23 of the Federal Rules of Civil Procedure and plaintiff's counsel as Lead Counsel;

B.     Awarding compensatory damages in favor of plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.     Awarding plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.     Such other and further relief as the Court may deem just and proper.

**JURY TRIAL DEMANDED**

Plaintiff hereby demands a trial by jury.

DATED:  June 27, 2017                    ROBBINS GELLER RUDMAN
                                                              & DOWD LLP
                                                         DAVID C. WALTON


                                                         *s/ David C. Walton*
                                                         DAVID C. WALTON

                                                         655 West Broadway, Suite 1900
                                                         San Diego, CA  92101-8498
                                                         Telephone:  619/231-1058
                                                         619/231-7423 (fax)

                                                         ROBBINS GELLER RUDMAN
                                                              & DOWD LLP
                                                         SAMUEL H. RUDMAN
                                                         58 South Service Road, Suite 200
                                                         Melville, NY 11747
                                                         Telephone:  631/367-7100
                                                         631/367-1173 (fax)

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

VANOVERBEKE, MICHAUD &
TIMMONY, P.C.
THOMAS C. MICHAUD
79 Alfred Street
Detroit, MI  48201
Telephone:  313/578-1200
313/578-1201 (fax)

Attorneys for Plaintiff

I:\Admin\CptDraft\Securities\Cpt Mattel.docx

## CERTIFICATION OF NAMED PLAINTIFF
## PURSUANT TO FEDERAL SECURITIES LAWS

WATERFORD TOWNSHIP POLICE & FIRE RETIREMENT SYSTEM ("Plaintiff") declares:

1.     Plaintiff has reviewed a complaint and authorized its filing.

2.     Plaintiff did not acquire the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action or any other litigation under the federal securities laws.

3.     Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4.     Plaintiff has made the following transaction(s) during the Class Period in the securities that are the subject of this action:

| Security | Transaction | Date | Price Per Share |
|----------|-------------|------|-----------------|

*See* attached Schedule A.

5.     Plaintiff has not sought to serve or served as a representative party in a class action that was filed under the federal securities laws within the three-year period prior to the date of this Certification except as detailed below:

*Galmi v. Teva Pharmaceutical Industries Limited, et al.*, No. 2:16-cv-08259 (C.D. Cal.).

6.     The Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of

MATTEL

any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 22 day of June , 2017.

WATERFORD TOWNSHIP POLICE & FIRE RETIREMENT SYSTEM

By: _____

Its: _____

- 2 -

MATTEL

**SCHEDULE A**

**SECURITIES TRANSACTIONS**

**Acquisitions**

| Date Acquired | Type/Amount of Securities Acquired | Price |
|---|---|---|
| 11/15/2016 | 3,620 | $32.12 |
| 11/28/2016 | 3,795 | $31.52 |
| 12/20/2016 | 3,000 | $28.92 |

**Sales**

| Date Sold | Type/Amount of Securities Sold | Price |
|---|---|---|
| 01/26/2017 | 10,415 | $26.28 |