LEVI & KORSINSKY, LLP
Adam C. McCall (SBN 302130)
445 South Figueroa Street, 31st Floor
Los Angeles, CA 90071
Tel: 213/985-7290
Fax: 202/333-2121
Email: amccall@zlk.com

*Attorneys for Lead Plaintiff*
*and Lead Counsel for the Class*

[Additional counsel on signature page]

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**WESTERN DIVISION**

| | | |
|---|---|---|
| WATERFORD TOWNSHIP POLICE & FIRE RETIREMENT SYSTEM, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>vs.<br><br>MATTEL, INC., CHRISTOPHER A. SINCLAIR, RICHARD L. DICKSON, KEVIN M. FARR and JOSEPH B. JOHNSON, | ) | Case No. 2:17-cv-04732-VAP-KS<br><br><u>CLASS ACTION</u><br><br>CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS<br><br><u>DEMAND FOR JURY TRIAL</u> |

Lead Plaintiff Gilberto Castro ("Plaintiff"), individually and on behalf of all others similarly situated, by his undersigned attorneys, alleges the following based upon information and belief as to the investigation conducted by plaintiff's counsel, which included, among other things, a review of U.S. Securities and Exchange Commission ("SEC") filings by Mattel, Inc. ("Mattel"), securities analyst reports, press releases, and other public statements issued by, or about, Mattel. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

**NATURE OF THE ACTION**

1. This is a securities class action on behalf of purchasers of Mattel's publicly traded securities between October 20, 2016 and April 20, 2017, inclusive (the "Class Period"), seeking to pursue remedies against defendants under the Securities Exchange Act of 1934 ("Exchange Act").

2. Mattel and its senior officers misled investors about Mattel's sales and operations during the Class Period. Through various public statements, defendants created the false impression that Mattel was successfully selling product in line with prior representations and previously stated targets. Defendants, however, were merely using enticing trade-spend promotions and discounts to over-supply Mattel's retailers with inventory in an effort to record as much revenue as possible during the 2016 holiday season. Defendants knew that the retailers already had more than enough inventory to last through the holiday season and that much of the inventory would need to be returned or steeply discounted, but added inventory to Mattel's distribution channels regardless.

3. What defendants did is referred to as "channel stuffing." The SEC has defined channel stuffing as follows: "[T]he pulling forward of revenue from future fiscal periods by inducing customers – through price discounts, extended payment terms or other concession – to submit purchase orders in advance of when they would otherwise do so." *In the Matter of Sunbeam Corp.*, Exchange Act Release No. 44305 (May 15, 2001) at 15. Channel stuffing is often used to deceive investors by creating a false impression of a company's financial and operational status. When used in this manner, channel stuffing is fraudulent and illegal.

4. Defendants used "channel stuffing" to artificially inflate revenue and conceal softening demand throughout its business. In 2015, Mattel lost the global rights to produce and sell toys based on Disney Princess® characters to its main competitor, Hasbro. This resulted in a major loss for Mattel, a loss that some analysts valued at $500 million annually.

5. According to former high-level Mattel employees, the loss of the Disney Princess® characters was the impetus behind the illegal channel stuffing at the center of this lawsuit. In an effort to compensate for the loss of Disney, Mattel fell into a pattern of over-shipping products to retailers by giving them various concessions to take on the excess inventory and help Mattel meet end-of-year financial targets. The concessions included dropping certain terms, allowing retailers to buy product on a direct import basis, and cutting prices. Mattel over-shipped and provided the concessions at "bigger and bigger scale" over time to make up for declining sales in Mattel's high margin doll business. The problem with Mattel's conduct in this regard was that it would, as one employee phrased it, "pay the devil in January."

6. Defendants' "channel stuffing" came to a head following the close of the 2016 fiscal year. On January 25, 2017, Mattel revealed that for the fourth quarter of fiscal 2016, worldwide net sales declined by 8% to $1.83 billion, gross margins declined by 14% to 47.0% and operating income declined by 11% to $262.6 million (year-over-year). The cause for the decline, as reported by Mattel's then-Chief Executive Officer, was that gross margins were "significantly impacted by elevated sales adjustments and by heavier discounting," which, in turn, had adversely impacted the cash generated by Mattel's operations. Defendants also acknowledged that high levels of sales adjustments and discounting were necessary to liquidate excess inventory in the retail channel. In response to these revelations, the price of Mattel stock fell approximately 18%, or $5.57 per share, on heavy trading volume to close at $25.99 per share on January 26, 2017.

7. The impact of defendants' actions carried over into the next year. Following the close of the first quarter of fiscal 2017, Mattel reported further losses due to "retail inventory overhang coming out of the holiday period." Mattel's earnings for the first quarter were

significantly below analyst expectations—the decline in net sales was twice the decline anticipated by analysts and gross margins were 520 basis points less than expected. In response to the news, on April 21, 2017, the price of Mattel stock fell nearly 14%, or $3.42 per share, on heavy trading volume to close at $21.79 per share on April 21, 2017.

8. Defendants did not disclose that Mattel was engaging in "channel stuffing." In fact, their public statements actively concealed it and prevented investors from determining whether the inventory in its retail channel was increasing, decreasing, or remaining constant. Unable to gauge the extent to which retailers were supplied with inventory, investors could not discern the true risk that Mattel would have to issue its customers sales adjustments or other financial concessions to help them clear bloated inventory levels, or the extent to which such inventory levels would adversely affect its future sales growth. Defendants provided excess supply to Mattel's retailers in order to create a misleading impression in the market of Mattel's financial health.

9. As a result of Mattel's unusually high levels of unsold inventory at its retailers, Mattel was exposed to the heightened risk that it would have to issue its retailers financial concessions (in the form of sales adjustments, discounts and promotions) to remove such excess inventory, as well as the heightened risk that it would experience slower sales growth in future periods. These risks ultimately materialized and, as a result, negatively impacted Mattel's earnings and stock price. In turn, investors in Mattel sustained significant financial damages as a result of defendants' fraudulent conduct.

## JURISDICTION AND VENUE

10. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and §27 of the Exchange Act [15 U.S.C. §78aa].

11. The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act [15 U.S.C. §§78j(b) and 78t(a)] and Rule 10b-5 promulgated thereunder by the SEC [17 C.F.R. §240.10b-5].

12. Venue is proper pursuant to §27 of the Exchange Act, as many of the acts and conduct complained of herein occurred in this District, and Mattel is headquartered in this District.

13. In connection with the acts alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the New York Stock Exchange ("NYSE"), a national securities exchange.

## PARTIES

14. Lead Plaintiff Gilberto Castro purchased Mattel securities at artificially inflated prices during the Class Period and has been damaged thereby. Plaintiff's transactions in Mattel securities were filed with the Court earlier in this action as an exhibit to a declaration in support of his motion for appointment as Lead Plaintiff. ECF Nos. 29, 30, 31. Plaintiff incorporates by reference his certification, and the information contained therein, into this Complaint as if it were set forth fully below.

15. Defendant Mattel is a multi-national toy manufacturing company that maintains its principal executive offices in El Segundo, California.

16. Defendant Christopher A. Sinclair ("Sinclair") was Mattel's Chief Executive Officer ("CEO") and Chairman of its Board of Directors until February 8, 2017, when defendant Sinclair resigned from his position as CEO and became Executive Chairman of Mattel's Board of Directors.

17. Defendant Richard L. Dickson ("Dickson") is, and was at all relevant times, Mattel's President and Chief Operating Officer ("COO").

18. Defendant Kevin M. Farr ("Farr") is, and was at all relevant times, Mattel's Chief Financial Officer ("CFO").

19. Defendant Joseph B. Johnson ("Johnson") is, and was at all relevant times, Senior Vice President and Corporate Controller of Mattel.

20. Defendants Sinclair, Dickson, Farr and Johnson are collectively referred to herein as the "Individual Defendants."

21. The Individual Defendants, because of their positions with Mattel, possessed the power and authority to control the contents of Mattel's reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors, *i.e.*, the market. Each Individual Defendant was provided with copies of Mattel's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, each of these Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading. The Individual Defendants are liable for the false statements pleaded herein, as those statements were each "group-published" information, the result of the collective actions of the Individual Defendants.

22. Mattel is liable for the acts of the Individual Defendants, and its employees under the doctrine of *respondeat superior* and common law principles of agency as all the wrongful act complained of herein were carried out within the scope of their employment with authorization.

23. The scienter of the Individual Defendants, and other employees and agents of Mattel are similarly imputed to Mattel under *respondeat superior* and agency principles.

## SUBSTANTIVE ALLEGATIONS

### A. Background

24. Defendant Mattel designs, manufactures, and markets a range of toy products worldwide. Mattel's portfolio of brands and products (referred to collectively herein as "products") are currently grouped into the following four major brand categories:

> *Mattel Girls & Boys Brands* – including Barbie® fashion dolls and accessories ("Barbie"), Monster High®, Ever After High®, Polly Pocket®, and DC Super Hero Girls™ (collectively "Other Girls"), Hot Wheels® and Matchbox® vehicles and play sets (collectively "Wheels"), and CARS®, DC Comics®, WWE® Wrestling, Minecraft®, Max Steel®, BOOMco.®, Toy Story®, and games and puzzles (collectively "Entertainment").

> *Fisher-Price Brands* – including Fisher-Price®, Little People®, BabyGear™, Laugh & Learn®, and Imaginext® (collectively "Core Fisher-Price"), Thomas & Friends®, Dora the Explorer®, Mickey Mouse® Clubhouse, and Disney Jake and the Never Land Pirates® (collectively "Fisher-Price Friends"), and Power Wheels®.

> *American Girl Brands* – including Truly Me®, Girl of the Year®, BeForever®, Bitty Baby®, and WellieWishers™. American Girl® Brands products are sold directly to consumers via its catalog, website, and proprietary retail stores, as well as sold directly to certain retailers.

> *Construction and Arts & Crafts Brands* – including MEGA BLOKS® and RoseArt®.

25. The majority of Mattel's products are sold to a relatively small retail customer base, with direct sales to retailers in the United States and Canada accounting for approximately one-half of Mattel's gross revenue. During the fiscal year ended December 31, 2016, Mattel's three largest customers, Wal-Mart Stores, Inc., Toys "R" Us, Inc. and Target Corporation, collectively accounted for approximately 39% of its net revenue, and its ten largest customers accounted for approximately 49% of its total net sales. In addition, Mattel's business is highly seasonal in nature, with the majority of its retail sales occurring during the September through December timeframe.

26. In the years just prior to the Class Period, Mattel began a downward trend in terms of performance relative to its competitors. As an illustration, during 2013, Mattel generated an operating profit margin of 18%, or 300 basis points better than its closest peer, Hasbro, Inc. ("Hasbro"). Just two years later, however, Mattel's 2015 operating profit margin declined by nearly 50% to 9.5%. This decline in operating profit margin largely resulted from deteriorating sales and gross margins, as well as higher promotional spending levels, as Mattel's products failed to resonate with consumers.

27. Defendants Sinclair and Dickson took control of Mattel's management in the spring of 2015 and embarked on an effort to turn the business around.

28. As detailed herein, at the start of the Class Period, Mattel announced its financial results for the quarter ended September 30, 2016 ("Q3 2016"). For Q3 2016, Mattel reported gross sales of $1.98 billion, in line with the prior-year period, and operating income of $317.4 million, approximately 6% better than the comparable prior-year period.

29. Unbeknownst to investors, Mattel achieved its favorable Q3 2016 results by over-supplying its retail customers with excess product in advance of the 2016 holiday selling season, i.e., "channel stuffing." Thereafter, during the 2016 fourth quarter ("Q4 2016"), Mattel was forced to issue large amounts of so-called "sales adjustments," including trade discounts and other allowances, and boost promotional spending to help retailers clear bloated levels of Mattel inventory. These sales adjustments had a material adverse effect on Mattel's operating results during Q4 2016. Indeed, the magnitude of the sales adjustments issued during Q4 2016 is illustrated in the following chart:



30. When defendants announced Mattel's 2016 year-end results, they disclosed that year-over-year worldwide net sales (gross sales after sales adjustments) for Q4 2016 declined by 8%, its gross margins declined by 14% and its operating income declined by 11% due to extraordinary sales adjustments and promotional costs incurred by Mattel during Q4 2016 to help clear the known, but undisclosed, massive pre-existing build-up of Mattel inventory in its retail channel. Indeed, at the end of the Class Period, Steven Totzke, Mattel's Executive Vice President and Chief Commercial Officer, publicly stated that he receives "live feedback" on the state of Mattel's inventory level, thereby acknowledging that defendants knew of the level of Mattel's products in the retail channel prior to and during the Class Period.

31. On January 25, 2017, when Mattel announced its Q4 2016 and year-end results, defendants, as detailed herein, disclosed adverse facts associated with Mattel's inventory and the price of Mattel stock fell approximately 18%, or $5.57 per share, on heavy trading volume to close at $25.99 per share.

32. Defendants, however, continued to mislead the market by downplaying the significance of the amount of retail inventory existing at the end of Q4 2016. Defendants misleadingly characterized the remaining retail inventory at the end of Q4 2016 as being "moderately," i.e., not extremely or excessively, elevated, and told investors that such inventory was within "a manageable range." Indeed, defendant Sinclair told investors that Mattel had just a "little bit of inventory in some pockets" to work through.

33. After the market closed on April 20, 2017, Mattel announced its operating results for the 2017 fiscal first quarter, the period ended March 31, 2017 ("Q1 2017"). The Q1 2017 results were significantly less than Wall Street securities analysts' consensus estimates due to a "retail inventory overhang coming out of the holiday period." In fact, Mattel's newly appointed CEO, Margaret Georgiadis ("Georgiadis"), who succeeded defendant Sinclair, noted that retail inventory levels during Q1 2017 were such that they had a "prolonged impact" on customer reorders.

34. In response to these revelations, the price of Mattel stock fell approximately 14%, or $3.42 per share, on heavy trading volume to close at $21.79 per share on April 21, 2017.

35. Indeed, at the beginning of the Class Period, securities analysts tried to gauge the extent to which Mattel's retail channel was supplied with inventory by questioning defendants about product shipments to retailers and retailer point-of-sale ("POS") data, as a comparison of these metrics would help investors discern whether Mattel inventory in its retail channel was increasing, decreasing or remaining constant.

36. In response to such inquires, defendants falsely represented that Mattel's shipments to retailers and retailer POS data were balanced, or "aligned," which created the illusion that Mattel's inventory in the retail channel was not over stocked.

37. In truth, however, retailers were bloated with Mattel's products, as shipments of Mattel's goods to retailers far exceeded retailer POS data. Unable to gauge the extent to which retailers were supplied with inventory, investors could not discern the true risk that Mattel would have to issue its customers sales adjustments or other financial concessions to help them clear bloated inventory levels, or the extent to which such inventory levels would adversely affect Mattel's future sales growth.

## B. Materially False and Misleading Statements Issued During the Class Period

*October 20, 2016*

38. The Class Period begins on October 20, 2016. After the market closed on October 19, 2016, Mattel issued a press release announcing its Q3 2016 financial results. For the quarter, Mattel reported that its worldwide net sales were up 2% year-over-year, on a constant currency basis, and its operating income had increased 5.5% over the comparable prior-year period. Defendant Sinclair commented on Mattel's Q3 2016 financial results and Q4 2016 outlook, stating, in pertinent part, as follows:[1]

> "In the third quarter, we continued to make solid progress against our strategic priorities, and we are pleased with our momentum as we head into the holiday season . . . . Our core brands continue to

[1] Unless otherwise noted herein, emphasis is added throughout.

> show improved strength and vibrancy, contributing to very encouraging and broad-based top-line momentum. And we continued to manage costs effectively, while making important investments in brand building, commercial excellence and emerging market expansion. Overall, our strategies are generating good progress on many fronts, and while we still have a critical fourth quarter to execute, ***we remain broadly on track to deliver on our full-year outlook.***"

39. Later that evening, Mattel held a conference call with securities analysts and investors to discuss the Q3 2016 operating results. During the conference call, defendant Sinclair suggested normal inventory levels existed in Mattel's retail channel, announcing that "consumer takeaway [was] aligning nicely with shipping," and stated, in pertinent part, as follows:

> So let me begin by saying that in the quarter, we continued to make some very good progress across all of our strategic priorities. ***We were especially encouraged by the momentum of our top line where our positive consumer takeaway [sales] is aligning nicely with [Mattel's] shipping.*** This increases our confidence as we get set for the holiday season and as we look to deliver on our challenging 2016 top-line objectives.

40. During the conference call, defendant Dickson then reinforced the notion that inventory in the retail channel was at ordinary levels by stating that Mattel's gross sales, i.e., customer product shipments, were "aligned" with retail POS data, stating, in pertinent part, as follows:

> As you know, ***POS is the true barometer of a brand's success*** with shipping ultimately aligning to it over time. And our turnaround efforts focusing on consumer demand creation and better global commercial alignment are clearly gaining traction.
>
> Excluding the impact of Disney Princess, global POS continues to be up mid-single digits for the quarter and year to date with solid results across the majority of our brands. ***And gross sales, excluding Disney Princess, are aligned to POS*** with sales in constant currency up low-double digits for the quarter and up high-single digits year to date.

41. Similarly, during the conference call, defendant Farr stated that product shipping during Q3 2016 was "better aligned" with positive retail POS, helping to position Mattel to execute and deliver its financial objectives during Q4 2016, stating, in pertinent part, as follows:

> Thank you, Richard, and good afternoon, everyone. Overall, our third-quarter results met expectations with ***shipping better aligned with positive POS***, which positions us well to execute the fourth quarter and deliver our challenging top-line objectives for the year. We continue to focus on managing the P&L, leveraging sales and POS momentum, and cost savings initiatives to help offset continued ForEx headwinds and short-term mix challenges.

42. Concerning Mattel's outlook, defendant Farr stated that "we don't see any significant changes to our full-year 2016 outlook," noting, in pertinent part, as follows:

> Looking ahead as Chris said, as we enter the fourth quarter, ***we don't see any significant changes to our full-year 2016 outlook.*** We have a lot of work to do to execute the fourth quarter and our focus remains on delivering operating profit by balancing our top-line and managing the middle of the P&L. As expected, the unfavorable impact of ForEx did lessen in the third quarter, which we believe will continue.
>
> And given our third-quarter results, our revenue outlook has not changed. We've gained confidence with our results to date and believe we are well positioned to meet our challenging 2016 revenue objective of relatively flat net sales in constant currency.
>
> At the same time, ***we will work hard to achieve a full-year gross margin of about 48.5%.*** This continues to be an important area of focus as we still face ForEx and mix headwinds but we do expect to be in the range of this target. ***It means that we need to achieve a fourth-quarter gross margin rate around 51%, which is a challenge, but well within the ranges we have achieved in the past. The sequential improvement in gross margin is supported by incremental volume, improved mix from stronger trends in our girls properties*** with American Girl, Barbie, and DC Superhero Girls, a smaller Disney Princess impact, and by incremental flow-through from our supply chain and other cost savings initiatives.

43. During the conference call's Q&A session, defendant Farr reiterated defendants' confidence in Mattel's ability to achieve its 2016 gross margin objective of 48.5%. The following exchange, in pertinent part, transpired:

> [Felicia Hendrix – Barclays Capital – Analyst:] Okay, thank you. ***So just sticking on the topic of gross margins,*** and Kevin, you kind of gave color and we could have backed into what you need to be for the fourth quarter and you kind of highlighted that it's challenging. But just given all of the inputs, the puts and takes to get to that number for the fourth quarter taking into consideration there's challenging [sic], I was just wondering how comfortable are you with your full-year gross margin outlook, ***like what could go wrong***[?].
>
> [Defendant Farr:] Yes, I think with regard to we don't control things like ForEx [sic], and there's a lot of moving pieces like mix but when we look at it ***we feel pretty confident with regard to the 48.5% target***, and we're working hard to achieve that and it's difficult to predict but we are working on a lot of the moving pieces including ForEx, mix, and incremental revenues, and we also expect to improve mix from our girls properties, American Girl, Barbie, and Disney or DC Superheroes. There is going to be a smaller impact from Disney Princess, and then we do see incremental flow through from our supply chain and other cost savings initiatives.

44. Following these positive statements, the price of Mattel stock rose $1.84 per share, or more than 6%, to close at $32.46 per share on October 20, 2016, on heavy trading volume.

45. The statements identified above in emphasis in paragraphs 38-43 were materially false and misleading. Contrary to defendants' statements, Mattel was not "on track" to deliver on its "full-year outlook" because "consumer takeaway" was not "aligning nicely with shipping." In reality, Mattel was shipping more inventory to its retailers than its retailers needed. Mattel was, in fact, providing its retailers with significant trade-spend promotions and discounting offers in an effort to ship as much inventory to its retailers as possible for the purpose of recording revenue for Mattel. Defendants knew that, at the time the inventory was

sold to the retailer, this inventory would subsequently be returned and/or steeply discounted. As a result of the foregoing, defendants lacked a reasonable basis for their positive statements about Mattel's then-current business and future financial prospects. Without the artificial boost from defendants' "channel stuffing," Mattel would have been forced to disclose significantly lower revenues and demand.

46. Additionally, absent from the above statements is any indication that Defendants were actively engaging in a "channel stuffing" scheme whereby Mattel was using trade-spend promotions and other discounting tactics to over-supply its retailers with inventory in an effort to inflate Mattel's revenue for the quarter. Defendants' omissions and misleading statements prevented investors from perceiving and evaluating the risk that Mattel would have to offer financial concessions to its retailers in order to clear inventory from its retail channels which, in turn, would have a negative impact on Mattel's earnings. Defendants' trade-spend promotions and discounting tactics ultimately "significantly impacted" Mattel's gross margins through "elevated sales adjustments" and "heavier discounting." The effect of defendants' conduct was so severe that it continued to negatively impact Mattel's earnings in 1Q 2017. Mattel failed to disclose that it offered discounts and other inducements to customers to sell merchandise immediately that otherwise would have been sold in later periods, which threatened to depress Mattel's future results of operations.

47. Defendants' "channel stuffing" scheme would have altered the total mix of information available to investors, as it would have indicated that Mattel's operations were weaker than Defendants publicly represented and that Mattel was unlikely to achieve its stated goals in terms of gross margins or profit. This information was, therefore, material and should have been disclosed.

*October 27, 2016*

48. On October 27, 2016, Mattel filed with the SEC its Form 10-Q for the quarter ended September 30, 2016 (the "Q3 Form 10-Q"), which was signed by defendant Johnson.

49. The Q3 Form 10-Q falsely represented that "[t]here have been no material changes to the risk factors disclosed under Part I, Item 1A 'Risk Factors' in Mattel's 2015

Annual Report on Form 10-K." This representation was materially false and misleading as the Q3 Form 10-Q failed to disclose the heightened financial risk associated with bloated retailer inventory levels, including the risk that Mattel may have to incur incremental costs to clear such inventory and the extent to which such inventory levels would adversely impact Mattel's future sales growth.

50. In addition, the Q3 Form 10-Q falsely and misleadingly represented that Mattel's disclosure controls were operating effectively when they were not, stating, in pertinent part, as follows:

> As of September 30, 2016, Mattel's disclosure controls and procedures were evaluated, with the participation of Mattel's principal executive officer and principal financial officer, to assess whether they are effective in providing reasonable assurance that information required to be disclosed by Mattel in the reports that it files or submits under the Securities Exchange Act of 1934 is accumulated and communicated to management, including its principal executive officer and principal financial officer, as appropriate, to allow timely decisions regarding required disclosure and to provide reasonable assurance that such information is recorded, processed, summarized, and reported within the time periods specified in Securities and Exchange Commission rules and forms. . . . ***Based on this evaluation, Christopher A. Sinclair, Mattel's principal executive officer, and Kevin M. Farr, Mattel's principal financial officer, concluded that these disclosure controls and procedures were effective as of September 30, 2016***.

51. The Q3 Form 10-Q also contained false and misleading certifications pursuant to the Sarbanes-Oxley Act of 2002 by defendants Sinclair and Farr on Mattel's disclosure controls and procedures, stating, in pertinent part, as follows:

> I, [defendant Sinclair/defendant Farr], certify that:
>
> 1. I have reviewed this quarterly report on Form 10-Q of Mattel, Inc.;
>
> 2. ***Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the***

***circumstances under which such statements were made, not misleading with respect to the period covered by this report***;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

(a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

(b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

(c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

> 5. The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the egistrant's board of directors (or persons performing the equivalent functions):
>
> (a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and
>
> (b) ***Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting***.

52. The statements identified above in emphasis in paragraphs 49-51 were materially false and misleading. Defendants were actively engaging in a "channel stuffing" scheme whereby Mattel was using trade-spend promotions and other discounting tactics to over-supply its retailers with inventory in an effort to inflate Mattel's revenue for the quarter. This information should have been disclosed and, in light of the fact that it was not, rendered the Q3 Form 10-Q and the accompanying Sarbanes-Oxley certifications materially misleading.

*53.* The Q3 Form 10-Q was also materially misleading because it failed to disclose the impact of defendants' "channel stuffing" scheme on Mattel's future financial results. Instead, the Q3 Form 10-Q explicitly excluded this information from its discussion of "Segment Data," stating that "***Mattel does not include sales adjustments such as trade discounts and other allowances in the calculation of segment revenues***." SEC Staff Accounting Bulletin No. 104 ("SAB 104") requires disclosures pertaining to a company's recognition of revenue where shipments of product at the end of a reporting period reasonably might be expected to result in lower shipments and revenue in the next period. In guidance concerning Management Discussion and Analysis within quarterly and annual reports, the SEC instructs companies to "specifically focus on known material events and uncertainties that would cause reported financial information not to be necessarily indicative of future operating performance or of future financial condition" in order to allow the public to "ascertain the

likelihood that past performance is indicative of future performance." SEC Interpretation: *Commission Guidance Regarding Management's Discussion and Analysis of Financial Condition and Results of Operations* (Release Nos. 33-8350; 34-48960; FR-72), Effective Date: December 29, 2003. The Q3 Form 10-Q failed to comply with these rules and, as a result, omitted material information concerning Mattel's operations and finances.

*November 3, 2016*

54. On November 3, 2016, defendants held Mattel's 2016 Analyst Day with investors and securities analysts ("Analyst Day"). During the Analyst Day, defendant Sinclair expressed confidence in Mattel's ability to drive "sustainable profitable growth," in part, due to its improving and growing shipping performance and retailer POS, stating, in pertinent part, as follows:

> ***[T]oday's Mattel is confident, aligned and focused on driving sustainable profitable growth*** and on building value for our shareholders.
>
> From our efforts to transform this company, a ***new foundation has been set***. And I think it's fair to say that ***Mattel's strategy*** to reenergize its creative culture and to align its global commercial organization around refocused brand management and revitalized strategic partnerships ***is working. And it's showing up in our results.***
>
> ***Our POS and shipping are significantly improved and growing.*** Our core brands are building strength. Our Toy Box is accelerating led by a vibrant slate of entertainment properties. We're increasing our space, merchandising and support with many of our key retail and online customers.
>
> We're also driving excellent growth in big emerging markets like China and Russia. And we've significantly improved our cost structure.
>
> And finally, we're effectively managing our P&L and balance sheet as we reinvest in growth, compensate for significant headwinds and foreign exchange [and] the loss of Disney Princess and support our dividend. Because of this momentum and of the foundation that

> we're building, ***I can say with a degree of confidence that we're poised for much more improved growth and a better outlook in '17 and beyond.***
>
> ***Over the balance of this morning, I hope that we can impart some of that same sense of confidence in all of you.***

55. Defendant Sinclair later highlighted the power of Mattel's brand portfolio to offset any revenue lost from the 2015 expiration of Mattel's global rights to produce and sell toys based on Disney Princess® characters, stating, in pertinent part, as follows:

> Consider the fact that despite the loss of Disney Princess, ***we're clearly on track to fully offset that shortfall by the end of this year***. To put that in perspective, that's essentially like creating a top 10 toy company in just one year's time. A true testament to the power and diversity of our brand portfolio and of our ability to execute effectively as a company.

56. In addition, defendant Dickson stated that Mattel's relationships with its retail partners were creating "great in-store executions," as validated by "positive and improving POS results," stating, in pertinent part, as follows:

> We have made significant strides in our relationships with our retail partners, which are not only resulting in increased shelf space but also allowing us to create great in-store executions.
>
> ***Our positive and improving POS results are proof that this is working. And we're taking in-store execution to a whole other level*** with our new American Girl shop within a shop here at Toys "R" Us and we'll look to use that model to build the bigger presence with our other brands in the near future.

57. Defendant Farr also made materially false and misleading statements about Mattel's operations. First, defendant Farr stated that, based, in part, on "strategic pricing" and other initiatives, Mattel was on track to deliver an approximate 48.5% gross margin for 2016, stating, in pertinent part, as follows:

> And as expected, gross margin was down in the third quarter primarily due to currency and mix, but these headwinds are being partially offset by significant cost savings, and while we expect

> foreign exchange to continue to lessen in the fourth quarter as it did in the third and mix to improve slightly.
>
> ***In the fourth quarter, we continue to rely on strategic pricing,*** cost savings and supply chain initiatives to partially offset the impact of forex and mix. Despite these headwinds, ***we remain on track to deliver a gross margin of about 48.5% for the full year.***

58. Defendant Farr then stated defendants expected to see improvements in Mattel's 2017 gross margins, as Mattel "grow[s] significantly in 2017," stating, in pertinent part, as follows:

> However, we do plan on seeing year-over-year improvement in gross margin percentages despite potential challenges with mix.
>
> We expect gross margins to improve in 2017 versus 2016 due to improved scale relative to our fixed supply chain cost base as we grow significantly in 2017, a stronger performance by our girls portfolio driven by Barbie, American Girl, and DC Superhero Girls, and improving margin structure for MEGA, as we invest in manufacturing and gain scale. And the opportunity to strategically price our portfolio particularly in international markets where currencies have weakened significantly over the past couple of years.

59. In addition, defendant Farr stressed that efficiencies in sales adjustments, i.e., trade discounts and other allowances, inventory management and advertising spending would improve operating margins, stating, in pertinent part, as follows:

> Turning to our P&L levers to improve operating margins for 2017, we should continue to be efficient in our sales adjustments, which we are targeting to be in our historical range of 9% to 9.5%. With growing revenues, we'll be building out a better retail fulfillment strategy to optimize retail inventory positions and our owned inventory positions.
>
> Better demand planning and sourcing systems would help ensure that the right inventory is in the right place at the right time, which should improve the efficiency of our sales adjustments. And we expect foreign exchange to be less of a headwind in 2017, but our path to get back to gross margins of around 50% will likely extend beyond 2017.

> . . .
>
> ***Like sales adjustments, we should continue to be efficient in our advertising*** and look to target spending on the lower end of our historical range of 11% to 13%.
>
> As I mentioned, we have a very strong entertainment lineup in 2017 so we'll not need to spend as much on advertising those licenses compared to our owned I.P.

60. During the Analyst Day Q&A session, defendant Dickson issued positive statements about Q4 2016 and retail POS data for Mattel's all important Barbie brand, stating, in pertinent part, as follows:

> [Unidentified Audience Member:] Can you comment on Barbie POS trends in the fourth quarter so far?
>
> [Defendant Dickson:] Well, ***so far so good. We've been quite pleased with Barbie's trend throughout the year*** for those tracking along which is a good group to say that to. . . . [T]he U.S. started out, I think, with a lot more momentum than the rest of the world as we indicated the rest of the world was catching up to all the marketing plans and some of the rollouts of the specific new refreshed product and as we've seen the rest of the world get traction overall, ***now we're really quite pleased with Barbie's POS performance.***
>
> We are heading into what was, last year, a very good POS here for Barbie and so we are lapping and planning to lap a pretty aggressive POS season. That being said, as you see and feel, ***we've got momentum behind the brand.*** We've got renewed purpose around how we market the brand and how we speak to the brand, not only to consumers, but we've got retailer confidence, we've got increased shelf space.
>
> We've implemented, if you will, media strategies surgically around the balance between traditional TV and digital.

61. The statements identified in paragraphs 54-60 above were materially false and misleading when made because they misrepresented and failed to disclose the following adverse facts, which were known to defendants or recklessly disregarded by them: (a) prior to and during the Class Period, Mattel's retail customers were loaded with extremely high levels

of unsold Mattel product; (b) as a result of Mattel's unusually high levels of unsold inventory at its retailers, Mattel was exposed to the heightened risk that it would have to issue its retailers financial concessions (in the form of sales adjustments, discounts and promotions) to remove such excess inventory, thus affecting Mattel's margin, as well as the heightened risk that Mattel would experience slower sales growth in future periods; and (c) as a result of the foregoing, defendants lacked a reasonable basis for their positive statements about Mattel's then-current business and future financial prospects.

*January 25, 2017*

62. On January 25, 2017, Mattel issued a press release announcing its Q4 2016 and year-end financial results for the period ending December 31, 2016.

63. For Q4 2016, Mattel reported that, on a year-over-year basis, worldwide net sales declined by 8% to $1.83 billion, gross margins declined by 14% to 47.0% and operating income declined by 11% to $262.6 million.

64. Later that day, Mattel held a conference call with analysts and investors ("Q4 conference call") to discuss Mattel's Q4 2016 and year-end financial results. During the Q4 conference call, defendant Sinclair stated that Mattel's gross margins were "significantly impacted by elevated sales adjustments and by heavier discounting," which, in turn, had adversely impacted the cash generated by Mattel's operations. Defendants also acknowledged that high levels of sales adjustments and discounting were necessary to liquidate excess inventory in the retail channel.

65. In response to these revelations, the price of Mattel stock fell approximately 18%, or $5.57 per share, on heavy trading volume to close at $25.99 per share on January 26, 2017.

66. Defendants, however, continued to mislead investors. First, defendant Sinclair misleadingly attributed Mattel's worse than expected Q4 2016 operating performance to "industry-wide challenges," including a significant slowdown in the U.S. toy category for the holiday period, stating in the press release, in pertinent part, as follows:

> Our results were negatively impacted by a number of industry-wide challenges, including a significant U.S. toy category slowdown in

> the holiday period, and increased forex headwinds . . . . And while our sales at retail remained strong, the slowdown triggered elevated retail promotional activity and decreased shipping, all of which had a significant impact on our gross margin.
>
> . . .
>
> Even against this difficult backdrop, our core brands continued to show solid growth, and our performance in key emerging markets like China was equally strong. And, importantly, we offset a substantial revenue gap from the loss of the Disney Princess license. Looking forward, we remain broadly optimistic about Mattel's performance in 2017 and beyond. Our core brands are strong and growing, we have a solid lineup of entertainment properties in the pipeline, and we are forging valuable relationships with key retail partners throughout the world."

67. As illustrated in the following chart, however, defendant Sinclair's "industry-wide" pretext for Mattel's Q4 2016 performance is belied by the 2016 fourth quarter financial results reported by Hasbro, Mattel's closest peer:

| **Mattel Inc. and Hasbro Inc. — Reported Key Financial Metrics (2016 Fourth Quarter)** | | |
|---|---|---|
| | **Mattel** | **Hasbro** |
| **Net Sales** | -8.27% | 11.23% |
| **Gross Profit** | -14.16% | 8.13% |
| **Operating Income** | -10.71% | -1.35% |

68. Significantly, defendants continued to mislead the market by downplaying the continuing risks associated with Mattel's existing retail inventory levels at the end of Q4 2016.

69. On the Q4 conference call, defendants characterized retail inventory levels as being "moderately," i.e., not extremely or excessively, elevated, and explained that such inventory was within "a manageable range."

70. During the Q&A session, defendants were questioned about the financial impact of the lingering excess inventory on Mattel's operating performance in the short run, which

defendants Sinclair and Farr misleadingly downplayed, stating that the inventory levels were at a "balancing point" and that excess inventory would be "quickly" eliminated. The following exchange, in pertinent part, transpired:

> [Greg Badishkanian – Citi – Analyst:] So, do you think you'll end Q1 with normalized inventory levels? And then, how much do you think the accelerated sales adjustments in Q1, how much will that impact Q1, if at all? And if you think that will continue into second quarter, assuming you have too high inventories entering into the second quarter? So, when will this kind of discontinue, in terms of the promotions, discounts, et cetera?
>
> [Defendant Sinclair:] Greg, I think ***I would expect we'd be in pretty decent shape on inventory as we get through the first quarter, and it's really in pockets. So, this is not a horrendous issue at this point.***
>
> But as far as the allowances and discounting, I think we expect that to kind of be back to normalized levels at this point. And remember, a lot of that is actually being used not for pure discounting; it was to help accelerate some shipments. And so, I think that's sort of reached sort of a balance point with the major retailers. And I'd say most of them are fairly comfortable with where they're at right now, and the exit POS certainly helped everybody.
>
> [Defendant Farr:] And I'd just like to add on. Sales were below expectations, but our owned inventory is of good quality. We've got mostly good brand POS momentum exiting the year. ***And we'll work through the extra inventory quickly***, and I don't think we have to discount it.

71. Defendant Farr noted further that "the moderately high level of year-end retail inventories will likely reduce our revenues in the first quarter and have less than a 2% impact for the full year of 2017." When a securities analyst sought additional clarification on this comment, defendant Sinclair deceptively stated, in pertinent part, that "we do have to work off a little bit of inventory in some pockets":

> [Tim Conder – Wells Fargo Securities – Analyst:] Just to follow on a little bit on the prior question here. I think you had said previously regarding 2017 top line outlook – and granted, Chris,

> what you just said, that the base bar has been lowered here – but I think previously you had said somewhere up between mid- and high-single digits. And then, Kevin, in your comment you said you see 2017 being impacted less than 2% for a full year.
>
> So, was that reference point up mid- to high-single digits for year-over-year growth and now you're saying that range comes off less than 2%? Is that the proper way we should hear what you're saying?
>
> [Defendant Sinclair:] I think that's probably a fair way to look at it, Tim. We're still confident that we're somewhere in the mid to the up-middle range of growth. ***But we do have to work off a little bit of inventory in some pockets.*** That's probably more of a first quarter issue, but obviously it affects full year.

72. The statements identified in paragraphs 66, 68-71 above were materially false and misleading because they created the false impression that inventory levels among Mattel's retailers was normalizing and was not problematic enough to continue to negatively impact Mattel's earnings. This was not true. Defendants' "channel stuffing" conduct was so extreme that Mattel would continue to suffer consequences into the first quarter of fiscal 2017. Having already over-supplied Mattel's retailers, Defendants were aware that their statements were materially misleading.

*<u>January 30, 2017</u>*

73. On January 30, 2017, Moody's put Mattel's credit on review for downgrade citing discounting at retail that contributed to narrowed profit margins and lower cash flow.

74. Mattel's stock price declined in response to Moody's announcement. From a closing price of $25.43 per share on January 27, 2017 (Friday), Mattel's stock price declined on heavier than normal volume to $25.27 per share on January 30, 2017. Mattel's stock price continued to decline over the following days, falling to $25.17 on January 31, 2017 and $24.49 on February 1, 2017.

*<u>February 17, 2017</u>*

75. On February 17, 2017, Mattel held its Toy Fair conference call with securities analysts and investors. During the conference call, defendant Farr falsely and misleadingly

stated that "[w]e expect first quarter revenues to be done [sic] [down] mid to high single digits as a result of the elevated retail inventory at year-end 2016," and that first quarter gross margin would also be down "moderately" due to the foreign exchange headwinds and some targeted inventory cleanup.

76. Mattel's stock price declined in response to these statements. From a closing price of $25.43 per share on February 17, 2017 (Friday), Mattel's stock price fell to $25.13 on February 21, 2017, $25.11 on February 22, 2017, and $24.88 on February 23, 2017.

77. Also during the Toy Fair presentation, Steven Totzke, Mattel's Executive Vice President and Chief Commercial Officer, represented to investors that he receives "live feedback" on the state of Mattel's inventory, stating, in pertinent part, "I get a lot of live feedback on the state of our space, and our product placement and our inventory levels."

*February 21, 2017*

78. On February 21, 2017, Mattel held the Q&A session of the Toy Fair conference call with securities analysts and investors. During the conference call, defendant Sinclair acknowledged that Mattel loaded up the retail channel in advance of Q4 2016 based upon "a pretty positive set of plans" for the quarter and later engaged in "discounting to support shipping and tried to move product off of retail," stating, in pertinent part as follows:

> Let me begin by sort of once again saying that, clearly, we had a difficult fourth quarter and we are disappointed with the results, which we found to be more difficult than anticipated. Essentially, ***what we had done is we had built a pretty positive set of plans for the fourth quarter based on the assumption that we would maintain the strong momentum we had in POS leading into the fourth quarter.***
>
> ***We obviously got into discounting to support shipping and tried to move product off of retail.*** At the same time that that was occurring, we faced another fairly big headwind, which was some of our international currencies. Particularly, the euro and the Mexican peso deteriorated fairly significant starting in November after the US election. So we kind of faced a perfect storm, if you will. We had two things coming together. And obviously, the fourth quarter was not what we anticipated.

> But I said again on Friday, look, we own the results. We think we made the right decisions at the time to try to get our shipments in and try to get product moving at retail. But clearly, it cost us financially. So net, not where we expected to be or wanted to be in the quarter.

79. Then, in response to an analyst's question on the state of Mattel's business in Europe, defendant Sinclair falsely and misleadingly represented that in Europe, Mattel was "in reasonably good shape" and "fairly healthy in terms of inventory." The following exchange, in pertinent part, transpired:

> [Linda Bolton Weiser - B. Riley & Co. – Analyst:] Thank you. So when you reported the fourth-quarter results, there was a lot of discussion around the significant increase in sales adjustments in North America. But when you really look at the results, the adjustment in North America was only about 2%, but it was actually quite a bit larger in Europe and Latin America. ***So, could you give us a little bit of state of the union kind of on those regional markets*** and how you ended the year and also, on a longer-term basis, where you think the opportunities are and how you are competitively in those markets?
>
> [Defendant Sinclair:] I'll take a shot at that one, Linda. Your assessments are completely accurate. The issues started here in North America with a slowdown, and that's where we sort of first responded. But it was almost simultaneous. We saw the same trends in Europe, and even Latin America showed some softening as well as Australia.
>
> I'd say we were probably better positioned here in the US, frankly, as we got into trying to get product into the stores and discounting, than we were in Europe. Europe, because Disney Princess was a much bigger factor, frankly, we probably had less in our arsenal (technical difficulty) work with. So I think we scrambled across the board. It was a combination of Europe, North America, and parts of Latin America where the sales get elevated discounting.
>
> ***On balance, though, I think we came out in Europe in reasonably good shape. Our trends were good. Our business there is fairly healthy in terms of inventory.***

80. The above statements in paragraphs 78-79 were materially misleading. Defendants' over-supplying of Mattel's retailers was far more severe than Defendants represented. Contrary to the impression created by Defendants, the effects of Defendants' "channel stuffing" were ongoing and would continue to negatively impact Mattel's operations throughout the first quarter of 2017. Mattel was experiencing prolonged, adverse financial effects from the existing overhang of unusually high levels of unsold retailer inventory during Q1 2017, including reduced orders by retailers. Accordingly, Q1 2017 North American and European sales, in particular, were experiencing sales shortfalls.

*February 23, 2017*

81. On February 23, 2017, Mattel filed with the SEC its Form 10-K for the year ended December 31, 2016 (the "Form 10-K"), which was signed by defendants Sinclair, Farr and Johnson. The Form 10-K contained false and misleading disclosures regarding risk factors and disclosure control procedures, as well as defendant Farr's certification thereon.

82. Although the Form 10-K provided investors with risk factors in Part I, Item 1A, the Form 10-K failed to disclose the heightened financial risk associated with bloated retailer inventory levels, including the risk that Mattel may have to incur incremental costs to clear such inventory and the extent to which such inventory levels would adversely impact Mattel's future sales growth.

83. In addition, the Form 10-K falsely and misleadingly represented that Mattel's disclosure controls were operating effectively when they were not, stating, in pertinent part, as follows:

> As of December 31, 2016, Mattel's disclosure controls and procedures were evaluated, with the participation of Mattel's principal executive officer and principal financial officer, to assess whether they are effective in providing reasonable assurance that information required to be disclosed by Mattel in the reports that it files or submits under the Securities Exchange Act of 1934 is accumulated and communicated to management, including its principal executive officer and principal financial officer, as appropriate, to allow timely decisions regarding required disclosure and to provide reasonable assurance that such information is

> recorded, processed, summarized and reported within the time periods specified in Securities and Exchange Commission rules and forms. ***Based on this evaluation, Margaret H. Georgiadis, Mattel's principal executive officer, and Kevin M. Farr, Mattel's principal financial officer, concluded that these disclosure controls and procedures were effective as of December 31, 2016***.

84. The Form 10-K also contained a false and misleading certification pursuant to the Sarbanes-Oxley Act of 2002 by defendant Farr on Mattel's disclosure controls and procedures, stating, in pertinent part, as follows:

> I, [defendant Farr], certify that:
>
> 1. I have reviewed this quarterly report on Form 10-K of Mattel, Inc.;
>
> 2. ***Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report***;
>
> 3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;
>
> 4. The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:
>
> (a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

(b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

(c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the egistrant's board of directors (or persons performing the equivalent functions):

(a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

(b) ***Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting***.

85. The statements identified above in emphasis in paragraphs 82-84 were materially false and misleading. Defendants had actively engaged in a "channel stuffing" scheme whereby Mattel was using trade-spend promotions and other discounting tactics to over-supply its retailers with inventory in an effort to inflate Mattel's revenue for the quarter. This information

should have been disclosed and, in light of the fact that it was not, rendered the Form 10-K and Defendant Farr's accompanying Sarbanes-Oxley certification materially misleading.

86. The Form 10-K was also materially misleading because it failed to disclose the impact of defendants' "channel stuffing" scheme on Mattel's future financial results in accordance with SAB 104 and SEC rules concerning Management Discussion and Analysis. The Form 10-K failed to comply with these rules and, as a result, omitted material information concerning Mattel's operations and finances.

*April 20, 2017*

87. On April 20, 2017, after the close of the market, Mattel issued a press release announcing its Q1 2017 financial results, the period ending March 31, 2017.

88. For the quarter, Mattel reported that, on a year-over-year basis, worldwide net sales and gross margins each declined by more than 15%, and its operating loss increased by more than 158% to $127.0 million from $49.1 million.

89. Mattel's newly appointed CEO, Georgiadis, commented on the Q1 2017 results, stating, in pertinent part, as follows:

> ***Our Q1 results were below our expectations due to the retail inventory overhang coming out of the holiday period***, but we remain encouraged by strong performance at retail for our key core brands, including Barbie, Hot Wheels and Fisher-Price as well as sustained momentum in high-growth markets like China . . . . We are confident we have worked through the majority of this overhang and look forward to a strong launch of Disney's Cars 3 theatrical release in the second quarter. While we have a lot of work to do to successfully position Mattel for the future, we see a clear runway to improving growth and profitability over time."

90. After the issuance of the Q1 2017 earnings release, Mattel held a conference call with securities analysts and investors. During the conference call, defendant Farr stated, in pertinent part, that "[w]hat we didn't expect was ***the prolonged impact from the retail inventory overhang and the resulting slower pace of reorders by retailers, with sales in North America and Europe particularly impacted.***"

91. Mattel's Q1 2017 results took securities analysts by surprise and were significantly below Wall Street consensus estimates. In fact, Mattel's 15% net sales decline during the quarter was twice the 7.8% decline expected by Wall Street analysts and its reported Q1 2017 gross margins were 520 basis points less than expected Wall Street consensus estimates. Moreover, Mattel's revenue decline during Q1 2017 was well above the "mid to high single digit[]" decline propounded by defendant Farr at Mattel's Toy Fair on February 17, 2017, when Q1 2017 was more than half complete.

92. These disclosures revealed to the public that defendants' prior statements were materially misleading. Over the course of the Class Period, defendants provided investors with unduly optimistic statements about Mattel's operations and finances. Defendants had failed to disclose that they were engaging in "channel stuffing" and, even when addressing the excess inventory in Mattel's retail channel after the close of the fourth quarter, defendants materially downplayed the extent of their deceptive conduct and the concessions that Mattel would have to provide in order to clear the inventory. The fact that Mattel was still suffering negative financial consequences in the first quarter of fiscal 2017 from actions that were taken in the fourth quarter of 2016 showed that defendants' "channel stuffing" conduct was far more severe than previously represented. Proof of this is evident in the fact that, in response to these revelations, the price of Mattel stock fell nearly 14%, or $3.42 per share, on heavy trading volume to close at $21.79 per share on April 21, 2017.

**C. <u>Additional Scienter Allegations</u>**

93. Defendants provided excess supply to Mattel's retailers in order to create a misleading impression in the market of Mattel's financial health. As alleged herein, defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of Mattel were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. Defendants, by

virtue of their access to or actual knowledge of information reflecting the true facts regarding Mattel, participated in the fraudulent scheme alleged herein.

94. Statements made during the Class Period confirm that the Individual Defendants had access to or possessed actual knowledge of facts contradicting the materially false and misleading statements identified above. In particular, Steven Totzke, Mattel's Executive Vice President and Chief Commercial Officer, stated that he received "live feedback" on the state of Mattel's inventory. In pertinent part, Totzke stated that, "I get a lot of live feedback on the state of our space, and our product placement and our inventory levels." Totske's statement supports the conclusion that defendants knew of the level of Mattel's products in the retail channel prior to and during the Class Period.

95. Witness statements from former Mattel employees further support an inference of scienter on the part of defendants. Former Employee 1 ("FE1") was a former Mattel Senior Vice President of Global Brands from October 2014 through October 2016. FE1 was responsible for developing product lines, marketing strategies and distribution plans for several of Mattel's brands. FE1 would develop a "tool kit" for each brand and then coordinate with other Mattel employees working in different regions to assist them in developing a strategy for promoting and selling brands in their respective markets. In the course of his employment, FE1 would routinely speak with representatives of Mattel's major retailers to inquire about retail sales, margins, and promotional activities. Mattel's top retailers included Wal-Mart, Target, Amazon, and Toys "R" Us. FE1 had several conversations with Mattel's sales team during his employment, including several meetings each year attended by Mattel's sales team and led by Totzke to discuss sales for the current year and strategies and expectations for sales the following year and into the future. FE1 reported to the Executive Vice President of Fischer Price (initially Geoff Walker and then Jean McKenzie), who in turn reported to Dickson who reported to Sinclair. FE1 worked in Mattel's New York City offices.

96. FE1 conducted an analysis of Mattel's marketing plans shortly after he joined Mattel in October 2014. He concluded that Mattel failed to execute its marketing plans and that such failure resulted in it selling too much product to its retailers to meet sales targets. Retailers

would then come back demanding concessions to help them meet a profit margin they targeted. Mattel became wrapped in a cycle of "robbing Peter to pay Paul" which hurt Mattel's brands, FE1 said. FE1 presented his analysis and findings to CFO Kevin Farr during a conversation in El Segundo, California in January 2015, FE1 said. Farr seemed surprised by the presentation and asked FE1 who was directing the failed strategy which trapped Mattel in a cycle undercutting its brands. FE1 told Farr, "It's your finance team!"

97. Mattel's practice of over-selling to retailers continued over the following years. According to FE1, Mattel had become trapped in a cycle of channel stuffing ever since its high margin fashion doll product line began to fall apart in 2014 and 2015. Fashion dolls offered twice the margin of other Mattel products, according to FE1. This meant that Mattel had to double the sales of its other products for every lost fashion doll sale, FE1 explained.

98. FE1 explained that, in 2014, Mattel learned that it would lose its license for Disney Princess fashion dolls to competitor Hasbro. By 2015, the Disney Princess license was lost and sales of Mattel's Frozen fashion dolls had started a dramatic decline, he said. Another fashion doll brand, Monster High, was also on the decline. To make up for the lost fashion doll sales, Mattel over shipped products to retailers by giving them various kinds of concessions to take on the excess inventory and help Mattel meet end-of-year financial targets, he said.

99. FE1 stated that Mattel's concessions included dropping certain terms, allowing retailers to buy product on a direct import basis and cutting prices. Mattel over-shipped and provided the concessions at "bigger and bigger scale" over time to make up for declining sales in Mattel's high margin fashion doll business. Mattel over-shipped products but had to "pay the devil in January," FE1 said. The over shipping of products was not tied to one or a few product lines, FE1 said. Rather, Mattel over shipped all its products, he said. FE1 recalled a conference he attended along with much of Mattel's sales team in Hong Kong in January 2016. During the conference, FE1 heard from Mattel salespeople that Mattel hit its sales targets for 2015 by loading retailers with inventory for which it would ultimately have to provide concessions.

100. Mattel's senior management, including the Individual Defendants, knew about Mattel's practice of over-selling to retailers and then providing concessions when inventory did not sell. For example, when Chris Sinclair took over as CEO in spring 2015, he asked for a monthly report on the health of all of Mattel's brands, FE1 recalled. The report included financials drawn from weekly and monthly point-of-sale reports. They were compiled by Mattel's market research group with help from FE1, Jean McKenzie (Executive Vice President of Fischer Price), Lisa Mancuso (former Senior Vice President of Global Brands), other global brand heads and various sales professionals and analysts. The reports required sign off each month from all of Mattel's brand teams before it could be delivered to Sinclair, FE1 said. Sinclair held numerous meetings with employees working on the fashion doll brands in response to steadily declining sales noted in the monthly reports given to him, FE1 said.

101. The reports were not the only way that senior employees could access information on product sales at Mattel. Weekly and monthly POS reports showed sales trends and retailer-level inventory levels, FE1 said. "We watch it every week," he said. "We kn[e]w precisely how much inventory is in every retailer." The weekly and monthly POS reports showed disappointing sales and increasingly bloated inventories at retailers over the course of 2016, FE1 said.

102. In 2015, Mattel asked its executive vice presidents to develop a plan for lost, high-margin, fashion doll sales, FE1 said. Due to declining fashion doll sales—most notably the Disney Princess brand that Mattel lost to Hasbro—Mattel set lower financial targets in 2015, he said. But in 2016, Mattel set financial targets that were impossible to hit without over shipping products to its retailers, FE1 explained. The plan to meet the 2016 sales targets simply made no sense, he said. FE1 recalled a quarterly meeting around September 2015 in which the plan was discussed. Mattel had developed a two-pronged approach. One part of the strategy was to increase advertising on Barbie, given its high margin compared to other brands. The other part of the strategy was to load retailers with various other less successful product lines. Among those other products were MixiQ's, a boys' battling top concept called Versus, products licensed from the Batman v. Superman movie, and AmiGami. Those products did not

materialize volume, FE1 said. Barbie sales did however pick-up, but were propped up by a high advertising budget.

103. During the quarterly meeting around September 2015, Evelyn Mazzocco, the Senior Vice President for Global Brands said that Barbie sales were improving, FE1 recalled. Geoff Walker, the Executive Vice President of Fischer Price before Jean McKenzie, asserted in the meeting that improving sales for Barbie were not enough to make up for declining sales in many of Mattel's other products. While sales improved for Barbie following increased advertising, the brand suffered from an abysmal advertising to sales ratio of 20%, Walker said, according to FE1. A healthy advertising to sales ratio would have been 5%-7%, according to FE1.

104. Based upon FE1's account of Mattel's operations, it had already developed a practice of over-selling to retailers in order to meet financial targets prior to the start of the Class Period. Moreover, according to FE1, Mattel's senior management (including Farr and Sinclair in particular) was aware of Mattel's practices in this regard. This information strongly supports the conclusion that Mattel continued "channel stuffing" into and throughout the Class Period and that the Individual Defendants were aware of it (contrary to their public statements).

105. Former Employee 2 ("FE2"), a Senior Customer Marketing Analyst for Mattel from February 2016 to August 2017, further supports Plaintiff's allegations. As a Senior Customer Marketing Analyst assigned to Mattel's seven-person Target Customer Marketing Team, FE2 helped develop promotional plans for Mattel brands sold at Target's retail outlets. FE2 was typically assigned a certain group of toys and then "basically came up with promotions for the toys inside Target stores," according to FE2. FE2's Target Team was within the larger Shopper Marketing Team which included teams dedicated to each of Mattel's four most important accounts: Amazon, Target, Toys "R" Us and Walmart. FE2 analyzed promotional campaigns from inception to completion, evaluating what worked along the way. She determined whether the sales generated by each campaign justified the costs associated with it. FE2 worked at Mattel's El Segundo, California headquarters and reported to Director of Customer Marketing for Target, Sai Patil and, later, Ryan Ciolla.

106. FE2 recalled that Mattel's sales never recovered after the 2015 holiday season, which left retailers with too much inventory on their shelves in early 2016. From when she arrived at Mattel in February 2016 until she left in August 2017, "sales were always down," FE2 said. "My first year we were told it was because they lost the contract for the Disney Princess brand, but this year [2017] it was the same issue." "Throughout [2016], we offered incentives for retail customers: you could buy one [toy] and get one free, or buy one and get half or another percentage off." If a store's buyer bought too much product they were allowed to discount it if it did not sell during the holidays, FE2 said. She recalled some items in 2016 were discounted months before the end of the year.

107. During Q3 2016 there was constant pressure to improve sales – the measure tricked down through the hierarchy, FE2 said. "There was definitely pressure to sell a lot," FE2 said. "[Pressure] came from the Vice President of Shopper Marketing then from under him it came from the five directors who oversee each account -- from him, to my director, to my manager, then to me." Her manager would call or send an email urging her to move product, she said.

108. By the end of 2016, the pre-existing build-up of Mattel inventory in the retail channel was a significant enough issue that it was understood within Mattel to be a "big problem." FE2 said she did not recall the exact timing, but before the holiday season had ended her superiors had decided to cut prices dramatically. FE2 recalled that Mattel's executives knew about the surplus inventory levels in the retail channel prior to Q4 2016 results because, based upon her recollection, "the prices were cut before the end of the year . . . [m]aybe three months before the end of the year around October or September."

109. FE2 recalled that, at least for Target, Mattel had access to the POS sales via its inventory information web portal where FE2 and her peers could check inventory by entering item numbers. "Through the Target site, you could type in a [product] number and see sales for that item," FE2 said. According to FE2, Barbie sales during the 2016 holiday season were continuing to lag with the fashion dolls line. Mattel employees received POS-data-based reports on inventory levels each week.

110. As described by FE2, Mattel placed a great deal of pressure on employees to flood its retail channels with inventory. Moreover, the Individual Defendants had decided to cut prices dramatically in an effort to over-supply retailers far in advance of the end of the year. Mattel had access to the inventory levels of its retailers based upon POS sales systems. Accordingly, defendants knew that reducing prices would only add to the inventory already within their retail channels.

111. Former Employee 3 ("FE3"), Mattel's former Senior Vice President and Chief Information Officer from August 2007 to June 2017, provided additional information in support of Plaintiff's claims. FE3 worked in Mattel's El Segundo, California headquarters where he reported to Defendant Farr. FE3 was responsible for Mattel's information technology services, including implementation of Mattel's information technology strategy, managing data center operations, and overseeing applications development. FE3 managed the information technology systems supply chain and oversaw information technology security and critical business capabilities. FE3 was responsible for the systems that managed Mattel's inventory and manufacturing processes. He managed approximately 250 employees stationed at more than 20 global locations as well as more than 700 contract workers and consultants.

112. According to FE3, Mattel rushed to remove inventory and other cost factors from its books for the end of 2016. Mattel's peak business period each year coincides with the end of their business year. "It creates an accounting problem: because all our money comes in at the end of the year, there's always this push to get inventory and other cost factors off the books," FE3 said. "It happened last year, at the end of 2016." FE3 explained that the way Mattel's upper management bonuses were calculated placed a disproportionate importance on inventory. "Inventory is such a big deal, you can hit all your numbers correctly, hit profitability and earnings per share, but if you don't clear inventory, it hurts your bonus," FE3 said.

113. In Q3 2016, Mattel relentlessly pushed its largest customers, among them Toys "R" Us, to accept additional inventory. "We offer[ed] discounts and essentially pay[ed] [the retailors] to hold inventory," FE3 said. "We get revenue in 2016; they get revenue in 2016, then they return [the surplus inventory] in 2017, but we still got revenue booked when we

needed it," he said. FE3 said that each sale was booked as revenue when the item left Mattel's warehouse.

114. At the highest level of Mattel, half of each executive's bonus was based on company results and the other half on personal results. "You can have the best year, but if Mattel doesn't hit overall [the bonus will be small]," FE3 said. "We didn't hit in 2016 due to inventory." "My understanding was we were very close, what hurt us was inventory -- we had too much based on what we were supposed to have," FE3 said. "The kicker was our cost was higher than expected; the head of our sales division Richard [Dickson], at the end of the year gave some very large pricing and cost discounts to the retailers and we incurred higher costs to try to get product sold." The timing of the pricing and cost discounts was intentional. According to FE3, CEO Sinclair, CFO Farr, COO Dickson, and Chief Supply Chain Officer Gibbons closely monitored the POS inventory at its customers through POS information coming in from their stores.

115. To entice retailors to accept excess inventory during their busiest season in Q3 and Q4 2016, Mattel aggressively pushed trade-spend and offered steep discounts and return allowances. Marketing and promotions played a huge role in pushing products through the channel in Q3 2016, FE3 said. While Mattel wanted to get as much product to each retailer as possible, the retail groups preferred to accept a minimum amount of a product and replenish when they needed to, not ahead of time. "In order to get retailers to take product, we had to offer rebates, trade spend and other incentives," FE3 said, recalling that a particularly "sharp discount" was offered in fall 2016. Another tactic Mattel used, FE3 said, was to tell its retail customers, "don't worry, we'll take it back," to let them know they would not be forced to keep the excess inventory. FE3 said that Mattel instructed the sales personnel to offer the incentives to retailors at sales meetings. "I think we did it every year," he said, noting that the directive came from the top of sales, Dickson, and trickled down through the ranks.

116. In 2016 in particular, Mattel fell short of its targets after Dickson, in an effort to push inventory into the channel, overspent on trade-spend incentives. Rebates, discounts, return allowances and trade spend were normal methods Mattel used to push product from their

warehouse to retailors in anticipation of the holiday season. In 2016, Dickson negatively impacted Mattel's margin by extending too much trade-spend to retailers. "In 2016, [Dickson], head of everything but manufacturing, went to extremes -- he very aggressively pushed trade-spend and discounts to get retail to take product," FE3 said. The word around the corporate office was that the upper managers failed to earn their bonus because Dickson "spent money selling product we couldn't sell," Rasumusson said. Trade-spend is money Mattel promises to spend to help retailors sell their products. "It can be anything from signage, to advertising, to just giving retailors money to spend on advertising or marketing," FE3 said. FE3 explained that Mattel depended more than its peers on trade-spend, return allowances and discounts to move its products, given the fact that Mattel relied on a small number of retailers. "If you get in trouble and Walmart won't take your line, you can't make those sales up -- you don't have 50 other accounts to go to," said FE3.

117. FE3 explained that the loss of licensing rights to the Disney Princesses was a significant setback for Mattel in 2016. "I'm not sure how big a gap; certainly in the hundreds of millions," FE3 said. "When we lost the millions that came from the princesses, the challenge was making up for that business when sales had been stagnant for years." During July, August and September 2016 and into the fall, inventory -- and the ways to move it -- were a constant topic of discussion among Mattel's senior management. "Inventory was discussed endlessly," FE3 said. "People became micro-focused on how to make our [number] this year – there was no investment in training or restructuring," FE3 said.

118. At the top of Mattel's corporate hierarchy concerns about deteriorating sales and slipping gross margins were persistent; Farr reported that both topics were "discussed at every executive meeting," FE3 said. The monthly executive meetings were attended by just five or six people, including Sinclair, Farr, Dickson and Gibbons. After Mattel's senior leadership finished their meeting, each executive communicated the gist of the meeting to their department staff. "As soon as the meeting was over, Kevin was pretty open. He wouldn't share the [meeting] agenda, but he'd say, 'we need to do this,' or, 'this is the biggest thing,'" FE3 said. "[Those directives] pressed down through senior leadership to each level of the company."

Frequently, including in Q3 and Q4 2016, the main takeaway from the monthly executive meetings was "we needed to get sales up," FE3 said.

119. FE3's account of Mattel's operations shows that the Individual Defendants were incentivized to over-supply Mattel's retailers with inventory. FE3, like FE1 and FE2, recalled that the loss of the Disney products created a gap in sales revenue that defendants attempted to fill by over-supplying Mattel's retailers with inventory. Significantly, defendants knew that inventory was not selling, but continued to supply Mattel's retailers with product.

120. When the truth concerning Mattel's "channel stuffing" practices emerged, the reaction was severe among investors and analysts. Mattel replaced Sinclair as CEO in February 2017 and Farr stepped down as CFO in July 2017. This change in management was significant and, given the fact that it occurred immediately following the disclosures concerning Mattel's inventory, suggests that Sinclair and Farr were in fact fired in connection with their material misrepresentations and fraudulent conduct. Further proof of this is evident in the fact that Sinclair and Farr signed Sarbanes-Oxley mandated certifications, which acknowledged their responsibility to investors for establishing and maintaining controls to ensure that material information about Mattel was made known to them and that Mattel's disclosure-related controls were operating effectively. That they failed to do this supports the conclusion that they were fired for cause.

121. The fraudulent scheme described herein could not have been perpetrated during the Class Period without the knowledge and complicity of, or at least the deliberate reckless disregard by, personnel at the highest levels of Mattel, including the Individual Defendants. The scienter of the Individual Defendants is imputed to Mattel under *respondeat superior* and agency principles.

**D. <u>Loss Causation</u>**

122. The market for Mattel securities was open, well developed and efficient at all relevant times. As a result of defendants' materially false and misleading statements and failures to disclose, Mattel securities traded at artificially inflated prices during the Class Period. Plaintiff and other members of the Class purchased Mattel securities relying upon the

integrity of the market prices of Mattel securities and market information relating to Mattel, and were damaged as a result.

123. During the Class Period, defendants materially misled the investing public by concealing (i) the true risk that Mattel would have to issue its customers sales adjustments or other financial concessions to help them clear bloated inventory levels and/or (ii) the extent to which such inventory levels would adversely affect Mattel's future sales growth. These risks materialized when, in the fourth quarter of 2016 and the first quarter of 2017, Mattel was forced to provide its customers with significant financial concessions and, in turn, Mattel's earnings were negatively impacted. Mattel's disclosures during these quarters, as well as reports from other analysts and credit rating agencies, resulted in significant declines in Mattel's stock price.

124. As a result of their purchases of Mattel securities during the Class Period, Plaintiff and the other Class members suffered economic loss, i.e., damages, under the federal securities laws. Defendants' false and misleading statements had their intended effect and caused Mattel securities to trade at artificially inflated levels throughout the Class Period, with Mattel's stock price reaching a high of $33.09 per share on October 21, 2016. At the end of the Class Period, Mattel's stock price was trading at $21.79 per share.

125. By concealing from investors the adverse facts detailed herein, defendants presented a misleading picture of Mattel's business, products and operations. When the truth about Mattel was revealed to the market, the price of Mattel securities fell significantly. The price declines removed the inflation from the price of Mattel securities, causing real economic loss to investors who had purchased Mattel securities during the Class Period.

126. The declines in the price of Mattel securities after the corrective disclosures came to light were the direct result of the nature and extent of defendants' fraudulent misrepresentations being revealed to investors and the market. The timing and magnitude of the price declines in Mattel securities negate any inference that the losses suffered by plaintiff and the other Class members were caused by changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to defendants' fraudulent conduct.

**E. Presumption of Reliance: Fraud on the Market Doctrine**

127. At all relevant times, the market for Mattel securities was an efficient market for the following reasons, among others:

(a) Mattel securities met the requirements for listing and was listed and actively traded on the NYSE, a highly efficient stock market;

(b) as a regulated issuer, Mattel filed periodic public reports with the SEC and the NYSE;

(c) Mattel regularly communicated with public investors via established market communication mechanisms, including the regular dissemination of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d) Mattel was followed by securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

128. As a result of the foregoing, the market for Mattel securities promptly digested current information regarding Mattel from all publicly available sources and reflected such information in the prices of the securities. Under these circumstances, all purchasers of Mattel securities during the Class Period suffered similar injury through their purchase of Mattel securities at artificially inflated prices and a presumption of reliance applies.

**F. No Safe Harbor; Inapplicability of Bespeaks Caution Doctrine**

129. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the material misrepresentations and omissions alleged in this Complaint.

130. To the extent certain of the statements alleged to be misleading or inaccurate may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors

that could cause actual results to differ materially from those in the purportedly forward-looking statements.

131. Defendants are also liable for any false or misleading "forward-looking statements" pleaded because, at the time each "forward-looking statement" was made, the speaker knew the "forward-looking statement" was false or misleading and the "forward-looking statement" was authorized and/or approved by an executive officer of Mattel who knew that the "forward-looking statement" was false. Alternatively, none of the historic or present-tense statements made by the defendants were assumptions underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by the defendants expressly related to or stated to be dependent on those historic or present-tense statements when made.

## CLASS ACTION ALLEGATIONS

132. Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all those who purchased Mattel publicly traded securities during the Class Period and who were damaged thereby (the "Class"). Excluded from the Class are defendants and their families, the officers and directors of Mattel, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

133. The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to plaintiff at this time and can only be ascertained through appropriate discovery, plaintiff believes that there are thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Mattel or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

134. Plaintiff's claims are typical of the claims of the members of the Class, as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law complained of herein.

135. Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class action and securities litigation.

136. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a) whether the federal securities laws were violated by defendants' acts as alleged herein;

(b) whether statements made by defendants to the investing public during the Class Period misrepresented material facts about the business and operations of Mattel;

(c) whether the prices of Mattel securities were artificially inflated during the Class Period; and

(d) to what extent the members of the Class have sustained damages and the proper measure of damages.

A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## COUNT I

### Section 10(b) of the Exchange Act and SEC Rule 10b-5 against Defendants

137. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

138. During the Class Period, defendants disseminated or approved the materially false and misleading statements specified above, which they knew, or deliberately disregarded, were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

139. Defendants: (a) employed devices, schemes and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices and a course of business that operated as a fraud and deceit upon the purchasers of Mattel's securities during the Class Period.

140. Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Mattel securities. Plaintiff and the Class would not have purchased Mattel securities at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by defendants' misleading statements.

141. As a direct and proximate result of these defendants' wrongful conduct, plaintiff and the other members of the Class suffered damages in connection with their purchases of Mattel securities during the Class Period.

## COUNT II

### Section 20(a) of the Exchange Act against the Individual Defendants

142. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

143. During the Class Period, the Individual Defendants participated in the operation and management of Mattel, and conducted and participated, directly and indirectly, in the conduct of Mattel's business affairs. Because of their senior positions, they knew the adverse non-public information about Mattel's misstatements.

144. As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information, and to correct promptly any public statements issued by Mattel which had become materially false or misleading.

145. Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Mattel disseminated in the marketplace during the Class Period concerning the misrepresentations. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Mattel to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of Mattel within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Mattel's securities.

146. Each of the Individual Defendants, therefore, acted as a controlling person of Mattel. By reason of their senior management positions and/or being directors of Mattel, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, Mattel to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised control over the general operations of Mattel and possessed the power to control the specific activities which comprise the primary violations about which Lead Plaintiff and the other members of the Class complain.

147. By reason of the above conduct, the Individual Defendants and/or Mattel are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Mattel.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff prays for relief and judgment, as follows:

(a) Determining that this action is a proper class action, designating plaintiff as Lead Plaintiff and certifying plaintiff as a Class representative under Rule 23 of the Federal Rules of Civil Procedure and plaintiff's counsel as Lead Counsel;

(b) Awarding compensatory damages in favor of plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c) Awarding plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d) Such other and further relief as the Court may deem just and proper.

## **JURY TRIAL DEMANDED**

Plaintiff hereby demands a trial by jury.

Dated: November 28, 2017

LEVI & KORSINSKY, LLP

By: s/ Adam C. McCall
Adam C. McCall (SBN 302130)
445 South Figueroa St., 31st Floor
Los Angeles, CA 90071
Tel: 213/985-7290
Fax: 202/333-2121
Email: amccall@zlk.com

-and-

Nicholas I. Porritt (*to be admitted pro hac vice*)
Adam M. Apton (*to be admitted pro hac vice*)
1101 30th Street N.W., Suite 115
Washington, D.C. 20003
Tel: 202/524-4290
Fax: 202/333-2121

*Attorneys for Lead Plaintiff and Lead Counsel for the Class*

# CERTIFICATE OF SERVICE

I hereby certify that on November 28, 2017, I electronically filed the foregoing CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS with the Clerk of the Court by using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing was automatically generated to the CM/ECF registrants on record. Participants in the case who are not registered CM/ECF users will be served by mail or by other means permitted by the court rules.

Dated: November 28, 2017

s/ Adam C. McCall
Adam C. McCall