United States District Court
Central District of California

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

FILED
CLERK, U.S. DISTRICT COURT
MAY 24, 2018
CENTRAL DISTRICT OF CALIFORNIA
BY: BH DEPUTY

Waterford Township Police and Fire Retirement System,

Plaintiff,

v.

Mattel, Inc., et al.

Defendants.

LA 17-cv-04732 VAP (KSx)

**Order GRANTING Defendants' Motion to Dismiss With Leave to Amend (Doc. No. 55).**

On January 24, 2018, Defendants Mattel, Inc. ("Mattel"), Richard L. Dickson ("Dickson"), Kevin M. Farr ("Farr"), Joseph P. Johnson ("Johnson"), and Christopher A. Sinclair ("Sinclair" and collectively "Defendants") filed their Corrected Motion to Dismiss ("Motion"), and a Request for Judicial Notice ("RJN"). (Doc. Nos. 55, 56). Lead Plaintiff Gilberto Castro ("Plaintiff") filed his opposition to Defendants' Motion on March 9, 2018, as well as an opposition to Defendants' RJN. (Doc. Nos. 57, 58). Defendants filed their reply in support of their Motion and a response in support of their RJN on April 9, 2018. (Doc. Nos. 59, 60).

After consideration of the papers filed in support of, and in opposition to the Motion, and the arguments raised during the May 21, 2018 hearing, the Court GRANTS Defendants' Motion with leave to amend.

## I. SUMMARY OF ALLEGATIONS

Plaintiff alleges the following facts in his Consolidated Complaint for Violations of the Federal Securities Laws ("Consolidated Complaint"). (Doc. No. 50).

### A. Parties

Mattel designs, manufactures, and markets a range of toy products for sale internationally. (Id. at ¶24). Its business is highly seasonal in nature, with the majority of its sales occurring during the September through December timeframe. (Id. at ¶25). Mattel's securities are listed and actively traded on the New York Stock Exchange, a highly efficient stock market. (Id. at ¶¶13, 31, 34).

Plaintiff is the lead plaintiff in this putative securities class action on behalf of purchasers of Mattel's publicly traded securities between October 20, 2016 and April 20, 2017 (the "Class Period"). (Id. at ¶1). He alleges that he purchased Mattel securities at artificially inflated prices during the Class Period and suffered damages as a result. (Id. at ¶14).

Sinclair was Mattel's Chief Executive Officer ("CEO") until February 2017, when he resigned as CEO and became Executive Chairman of Mattel's Board of Directors. (Id. at ¶16; see also, Doc. No. 56-14).

Dickson is, and was at all relevant times, Mattel's President and Chief Operating Officer ("COO"). (Doc. No. 50 at ¶17).

United States District Court
Central District of California

United States District Court
Central District of California

Farr was Mattel's Chief Financial Officer ("CFO") during the Class Period and resigned from this position in July 2017. (Id. at ¶18; see also, Doc. No. 56-15).

Johnson is, and was at all relevant times, Senior Vice President and Corporate Controller of Mattel. (Doc. No. 50 at ¶19).

**B. Mattel's Cycle of Seasonally Overselling Inventory to Retailers**

In the years leading up to the Class Period, Mattel began a downward trend in performance relative to its competitors. (Id. at ¶26). From 2013 to 2015, Mattel's profit margin declined from 18% to 9.5%. (Id.). This decline was the result of deteriorating sales and gross margins as well as higher promotional spending levels. (Id.). Mattel had fallen into a cycle of first overselling to retailers in an attempt to meet end-of-year sales targets and then offering concessions to retailers to make up for the inventory the retailers could not sell to consumers. (Id. at ¶96-97). To make matters worse, in 2015 Mattel lost the global rights to produce and sell toys based on Disney Princess® characters to its main competitor, Hasbro. (Id., ¶4, 98, 102, 117). This was a major loss for Mattel. (Id.).

Sinclair and Dickson took control of Mattel's management in the spring of 2015 with the goal of improving Mattel's business. (Id. at ¶27). After the loss of the Disney Princess line of fashion dolls, Mattel set lower financial targets for 2015 but adopted a more bullish approach for 2016. (Id. at

¶102). As it had done in years past, Mattel offered generous incentives for retail customers to boost sales during the year-end holiday season, while giving retailers permission to sell products at a steep discount after the holiday season. (Id. at ¶¶106, 113, 115-19). Mattel told its retail customers that they would not be forced to keep excess inventory, and that Mattel would take it back in 2017 if it would not sell. (Id.). Mattel put pressure on employees to enact this strategy, in part because upper management bonuses were calculated based on inventory levels. (Id. at ¶112, 114).

United States District Court
Central District of California

### C. Q3 2016 Results

#### 1. Mattel's October 19, 2016 Press Release

After the market closed on October 19, 2016, Mattel issued a press release announcing that for the financial quarter ending September 30, 2016 ("Q3 2016"), its worldwide net sales were up 2% year-over-year, on a constant currency basis, and its operating income had increased 5.5% over the comparable prior-year period. (Id. at ¶38).

#### 2. Defendants' October 20, 2016 Statements

The day after the October 19, 2016 press release, Defendants made various statements about the outlook for Q4 2016 that were optimistic but excluded important information about Defendants' aggressive efforts to boost sales to retailers. (Id. at ¶¶45-46).

For example, Sinclair commented on Mattel's Q4 2016 outlook, saying "while we still have a critical fourth quarter to execute, we remain broadly on track to deliver our full-year outlook." (Id. at ¶38). Later, Sinclair held a

conference call with securities analysts and investors to discuss Q3 2016 operating results, and stated "[w]e were especially encouraged by the momentum of our top line where our positive consumer takeaway [sales] is aligning nicely with [Mattel's] shipping. This increases our confidence as we get set for the holiday season and as we look to deliver on our challenging 2016 top-line objectives." (Id. at ¶39). Dickson and Farr made similar, optimistic statements on this call. (Id. at ¶¶40-43).

Following these statements, Mattel's stock rose more than 6%. (Id. at ¶44).

**3. Mattel's October 27, 2018 SEC Filings**

On October 27, 2016, Mattel filed its Form 10-Q with the SEC for Q3 2016 (the "Q3 Form 10-Q"). (Id. at ¶48). This form stated that "[t]here have been no material changes to the risk factors disclosed . . . in Mattel's 2015 Annual Report on Form 10K" and that Mattel's disclosure controls were operating effectively. (Id. at ¶49). The Q3 Form 10-Q also contained Sarbanes-Oxley Act of 2002 ("Sarbanes Oxley") certifications on Mattel's disclosure controls and procedures from Sinclair and Farr. (Id. at ¶51). The Q3 Form 10-Q noted that it "does not include sales adjustments such as trade discounts and other allowances in the calculation of segment revenues." (Id. at ¶53).

**4. Defendants' November 3, 2016 Analyst Day Statements**

On November 3, 2016, Defendants conducted a presentation and question and answer session with investors and securities analysts for Mattel's 2016 Analyst Day ("Analyst Day"). (Id. at ¶54). As part of Analyst

United States District Court
Central District of California

Day, Sinclair, Dickson, Farr made various positive statements about Mattel's financial condition, and projected positive performance for Mattel in the future. (Id. at ¶¶54-61).

### D. Q4 2016 Results

#### 1. Defendants' January 25, 2017 Statements

Mattel announced its Q4 2016 and year-end results in a press release on January 25, 2017. (Id. at ¶¶31, 62). Mattel reported that, on a year-over-year basis, worldwide net sales declined by 8% to $1.83 billion, gross margins declined by 14% to 47.0%, and operating income declined by 11% to $262.6 million. (Id. at ¶63). The press release pointed to several factors to explain these results, including "a significant U.S. toy category slowdown in the holiday period" and foreign currency issues which "triggered elevated retail promotional activity and decreased shipping. All of which had a significant impact on [Mattel's] gross margin." (Id. at ¶66).

Later that day, Defendants held a conference call with analysts and investors ("Q4 conference call") to discuss Mattel's disappointing Q4 2016 and year-end financial results. (Id. at ¶64). During this call, Sinclair stated that Mattel's gross margins were "significantly impacted by elevated sales adjustments and by heavier discounting" and that high levels of sales adjustments and discounting were necessary to liquidate excess inventory in the retail channel. (Id.). Defendants characterized retail inventory levels as being "moderately" elevated, and explained that such inventory was within "a manageable range." (Id. at ¶69). For example, when asked about

United States District Court
Central District of California

when Mattel would normalize inventory levels, Sinclair responded that he expected Mattel would "be in pretty decent shape on inventory as we get through the first quarter, and it's really in pockets. So this is not a horrendous issue at this point." (Id. at ¶70). Farr also stated that "we'll work through the extra inventory quickly, and I don't think we have to discount it." (Id.).

In response to these statements, the price of Mattel stock fell $5.57 per share on heavy trading volume to close at $25.99 per share on January 26, 2017. (Id. at ¶65).

United States District Court
Central District of California

### 2. On January 30, 2017 Moody's Places Mattel's Credit On Review

Moody's put Mattel's credit on review for downgrade citing discounting at retail that contributed to narrow profit margins and lower cash flow. (Id. at ¶73). Mattel's stock price declined in response to Moody's announcement from $25.43 per share on January 27, 2017 to $25.27 per share on January 30, 2017, with further declines in the following days. (Id. at ¶74).

### 3. February 17, 2017 Toy Fair Conference Call

On February 17, 2017, Mattel held a conference call with securities analysists and investors as part of its "Toy Fair." (Id. at ¶75). During the call, Farr stated that "[w]e expect first quarter revenues to be [down] mid to high single digits as a result of the elevated retail inventory at year-end 2016." (Id.). Also during the call, Steven Totzke, Mattel's Executive Vice President and Chief Commercial officer, represented to investors that he receives "live feedback" on the state of Mattel's inventory." (Id. at ¶77).

Mattel's stock price declined in response to this conference call. (Id. at ¶76). From a closing price of $25.43 per share on February 17, 2017 (Friday), Mattel's stock price fell to $25.13 on February 21, 2017. (Id.).

**4. February 21, 2017 Toy Fair Q&A Session**

On February 21, 2017, Mattel held a question and answer session with securities analysts and investors as part of the Toy Fair conference. (Id. at ¶78). Sinclair recognized the poor results of Q4 2015, stating that Mattel "clearly . . . had a difficult fourth quarter and we are disappointed in the results, which we found to be more difficult than anticipated." (Id.). He explained that these results were due to a combination of "discounting to support shipping . . . to move product off of retail" as well as the deterioration of the Euro and Mexican Peso following the November 2016 elections in the United States. (Id.). In response to an inquiry regarding the state of the European markets, Sinclair stated that "on balance . . . I think we came out in Europe in reasonably good shape. Our trends were good. Our business there is fairly healthy in terms of inventory." (Id. at ¶79).

**E. Q1 2017 Results**

**1. Mattel's February 23, 2017 SEC Filing**

On February 23, 2017, Mattel filed a Form 10-K with the SEC for the year ending in December 31, 2016. (Id. at ¶81). This form was signed by Sinclair, Farr, and Johnson. (Id.) It contained various risk factors and represented that Mattel's disclosure controls were operating effectively. (Id. at ¶¶81-84).

United States District Court
Central District of California

United States District Court
Central District of California

**2. Defendants' April 20, 2017 Statements**

On April 20, 2017, Mattel issued a press release announcing its financial results, for the quarter ending March 31, 2017 ("Q1 2017"). (Id. at ¶87). In this press release, Mattel reported a drop in worldwide net sales and gross margin for Q1 2017, and that its operating loss had increased by more than 158% to $127.0 million from $49.1 million. (Id. at ¶88).

These results were worse than Wall Street analysts had anticipated and what Defendants had predicted. (Id. at ¶91). Mattel's newly appointed CEO, Margaret Georgiadis explained that "[o]ur Q1 results were below our expectations due to the retail inventory overhang coming out of the holiday period," but she remained optimistic that "[Mattel] [has] worked through the majority of this overhang" and "see[s] a clear runway to improving growth and profitability over time." (Id. at ¶89). In a subsequent conference call, Farr stated that Mattel did not expect "the prolonged impact from the retail inventory overhang and the resulting slower pace of reorders by retailers" particularly in North America and Europe. (Id. at ¶90).

In response to these statements, the price of Mattel stock fell nearly 14%, or $3.42 per share, on heavy trading volume to close at $21.79 per share on April 21, 2017. (Id. at ¶92).

***

Based on the foregoing, Plaintiff brings two claims: (1) Violation of Section 10(b) of the Securities and Exchange Act of 1934 ("Exchange Act")

and Rule 10b-5 against all Defendants; and (2) Violation of Section 20(a) of the Exchange Act against Dickson, Farr, Johnson, and Sinclair.

## II. REQUEST FOR JUDICIAL NOTICE

Defendants filed a Request for Judicial Notice ("RJN") in support of their Motion on January 24, 2018. (Doc. No. 56). Defendants asks the court to take judicial notice of nineteen documents.

Eight of these documents, Exhibits 4, 5, 7, 12, 13, 16, 17, and 18 are referred to or quoted in Plaintiff's Complaint. (Compare Doc. No. 1 at ¶¶38-43, 62-63, 64, 66, 69-71, 73, 78-79, 81-85, 89-90 and Doc. Nos. 56-4, -5, -7, -12, -13, -16, -17, and -18), and Plaintiff does not object to the request as to them, nor does he question their authenticity. (See Doc. No. 58). "Documents whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the pleading, may be considered in ruling on a Rule 12(b)(6) motion to dismiss." In re Stac Electronics Securities Litigation, 89 F.3d 1399, 1405 (9th Cir. 1996) (internal quotation marks and alterations removed). Accordingly, the Court GRANTS Defendants' RJN with respect to Exhibits 4, 5, 7, 12, 13, 16, 17, and 18.

Defendants also ask the Court to take judicial notice of Exhibits 1, 2, 6, 14 and 15 – five documents that are publicly available transcripts from Mattel's earnings calls and excerpts from its SEC filings. (Doc. No. 56 at 3; Doc. No. 56-1 (Q4 2015 Mattel, Inc. Earnings Call); Doc. No. 56-2 (Q3 2014 Mattel, Inc. Earnings Call); Doc. No. 56-6 (Excerpts from Mattel, Inc. FY

United States District Court
Central District of California

United States District Court
Central District of California

2015 Form 10-K); Doc. No. 56-14 (January 11, 2017 Mattel Form 8-K); Doc. No. 56-15 (Oct. 3, 2017 Mattel Form 8-K)). It is appropriate for the Court to take judicial notice of such documents. See Dreiling v. Am. Exp. Co., 458 F.3d 942, 946 n.2 (9th Cir. 2006) (holding that SEC filings are subject to judicial notice); In re Ditech Commc'ns Corp. Sec. Litig., No. C 05-02406 JSW, 2006 WL 2319784, at *5 (N.D. Cal. Aug. 10, 2006) (holding that "press releases, SEC filings, [and] transcripts of . . . Earnings Release Conference calls . . . are the types of documents of which this Court properly may take judicial notice."). Furthermore, Plaintiff does not object to this request or dispute the accuracy of these documents. Accordingly, the Court GRANTS Defendants' RJN with respect to Exhibits 1, 2, 6, 14, and 15.

Defendants also request that the Court take judicial notice of Exhibit 19, a November 2016 Analyst Day Presentation. (Doc. No. 56 at 3-4; Doc. No. 56-19). Defendants argue that this document contains cautionary statements that accompanied the November 2, 2016 presentation referenced in Plaintiff's Complaint. (Doc. No. 56 at 3l; Doc. No. 1 at ¶54-60). While this document does not appear to contain any cautionary statements, it appears to have been "publicly available to reasonable investors at the time the defendant made the allegedly false statements" referenced in Plaintiff's Complaint, and on that basis the Court may take judicial notice of this document. In re Copper Mountain Sec. Litig., 311 F. Supp. 2d 857, 864 (N.D. Cal. 2004). Plaintiff does not object to the Court taking judicial notice of this document. Accordingly, the Court GRANTS Defendants' RJN with respect to Exhibit 19.

United States District Court
Central District of California

Defendants also ask the Court to take judicial notice of Exhibit 11, a chart of U.S. Dollar exchange rates taken from the Federal Reserve website. (Doc. No. 56 at 4; Doc. No. 56-11). "Exchange rates listed on the Federal Reserve's system are a fitting subject of a request for judicial notice." Krystal Inc. v. China United Transp., Inc., No. 5:16-cv-02406 RSWL (SPx), 2017 WL 4339343, at *2 (C.D. Cal. Sept. 26, 2017) (internal quotation marks removed). Furthermore, Plaintiff does not object to this Court taking judicial notice of this document. Accordingly, the Court GRANTS Plaintiff's RJN with respect to Exhibit 11.

Defendants also seek judicial notice of Exhibits 8-10: copies of industry analyst reports that were referenced in statements made during Mattel's earnings call on January 25, 2017. (Doc. No. 56 at 3; Doc. Nos. 56-8, -9, -10). Plaintiff opposes the request as to these documents. (Doc. No. 58). Plaintiff primarily takes issue with how he perceives Defendants to be using these exhibits. Plaintiff argues Defendants are using these exhibits as an improper attempt to counter factual allegations in Plaintiff's Complaint. The Court agrees that it would be improper to take judicial notice of these documents for the truth of the matters discussed therein at this stage of the litigation. It is proper to consider whether and when certain information became available to investors, however. See, e.g., In re Questcor Sec. Litig.., No. 8:12-cv-01623 DMG (FMOx), 2013 WL 5486762, at *2 (C.D. Cal. Oct. 1, 2013) (taking judicial notice of analyst reports "to establish whether and when certain information was provided to the market, not the truth of the matters asserted therein.") (internal quotation marks removed). The Court therefore GRANTS Defendants' RJN with respect to Exhibits 8-10,

United States District Court
Central District of California

and takes judicial notice of these exhibits for the limited purpose of determining whether and when this information was available to investors.

## III. LEGAL STANDARD

### A. Motion to Dismiss Standard of Review

Under Rule 8(a), a complaint must contain a "short and plain statement of the claim showing that the [plaintiff] is entitled to relief." Fed. R. Civ. P. 8(a). If a complaint fails to do this, the defendant may move to dismiss it under Rule 12(b)(6). Fed. R. Civ. P. 12(b)(6). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (citation omitted). A claim is plausible on its face "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. "Factual allegations must be enough to raise a right to relief above the speculative level." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007). Thus, there must be "more than a sheer possibility that a defendant has acted unlawfully." Iqbal, 556 U.S. at 678. "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility'" that the plaintiff is entitled to relief. Id. (quoting Twombly, 550 U.S. at 557).

In ruling on a motion to dismiss for failure to state a claim, a court should follow a two-pronged approach: first, the court must discount conclusory statements, which are not presumed to be true; and then,

United States District Court
Central District of California

assuming any factual allegations are true, the court shall determine "whether they plausibly give rise to entitlement to relief." See id. at 679; accord Chavez v. United States, 683 F.3d 1102, 1108 (9th Cir. 2012). A court should consider the contents of the complaint and its attached exhibits, documents incorporated into the complaint by reference, and matters properly subject to judicial notice. Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 322–23 (2007); Lee, 250 F.3d at 688.

Furthermore, when a district court grants a motion to dismiss, it should provide leave to amend unless it is clear that the complaint could not be saved by any amendment. Manzarek v. St. Paul Fire & Marine Ins. Co., 519 F.3d 1025, 1031 (9th Cir. 2008) ("Dismissal without leave to amend is improper unless it is clear, upon de novo review, that the complaint could not be saved by any amendment."). Where allowing the plaintiff to amend his complaint would be "an exercise in futility," however, the court need not grant leave to amend. DCD Programs, Ltd. v. Leighton, 833 F.2d 183, 186 (9th Cir. 1987).

**B. Section 10(b) of the Exchange Act and SEC Rule 10b-5**

Section 10(b) of the Exchange Act prohibits "any manipulative or deceptive device or contrivance in contravention of [SEC regulations] in connection with the purchase or sale of any security registered on a national securities exchange." 15 U.S.C. 78j(b) (2010). Rule 10b-5 prohibits companies from "mak[ing] any untrue statement of a material fact," "omit[ting] to state a material fact necessary in order to make the statement

United States District Court
Central District of California

made . . . not misleading," and "engag[ing] in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person." 17 C.F.R. 240.10b-5.

"There are six elements to a securities fraud claim under § 10(b) and Rule 10b-5: (1) a material misrepresentation or omission; (2) scienter (i.e., a wrongful state of mind); (3) a connection between the misrepresentation and the purchase or sale of a security; (4) reliance upon the misrepresentation (often established in 'fraud-on-the-market' cases via a presumption that the price of publicly-traded securities reflects all information in the public domain); (5) economic loss; and (6) loss causation." Loos v. Immersion Corp., 762 F.3d 880, 886-87 (9th Cir. 2014). These elements are "strenuous but well established." Curry v. Yelp Inc., 875 F.3d 1219, 1224 (9th Cir. 2017).

**C. Section 20(A) of the Exchange Act**

To establish a claim under § 20(a), a plaintiff "must first prove a primary violation of underlying federal securities laws, such as Section 10(b) or Rule 10b-5, and then show that the defendant exercised actual power over the primary violator." In re NVIDIA Corp. Sec. Litig., 768 F.3d 1046, 1052 (9th Cir. 2014).

United States District Court
Central District of California

## IV. PLAINTIFF FAILS TO PLEAD FALSITY

### A. Plaintiff Fails to Plead Falsity with Particularity As Required by the PSLRA

As the Consolidated Complaint brings securities fraud claims, it is subject to the heightened pleading standards set forth in Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. § 78u-4. Zucco Partners, LLC v. Digimarc Corp., 552 F.3d 981, 990 (9th Cir. 2009). Rule 9(b) requires that "a party must state with particularity the circumstances constituting fraud or mistake." The Ninth Circuit has held that Rule 9(b) further requires "an account of the time, place, and specific content of the false representations as well as the identities of the parties to the misrepresentations," and that the allegations "be specific enough to give defendants notice of the particular misconduct which is alleged to constitute the fraud charged." Swartz v. KPMG LLP, 476 F.3d 756, 764 (9th Cir. 2007) (internal citations omitted). Similarly, the PSLRA requires that "the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1)(B); Tellabs, Inc. v. Maker Issues & Rights, Ltd., 551 U.S. 308, 321 (2007). "[W]hen a plaintiff relies on a theory of omission, the plaintiff must allege 'facts going to the basis for the issuer's opinion . . . whose omission makes the opinion statement at issue misleading to a reasonable person reading the statement fairly and in context.'" City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc., 856 F.3d 605, 615–16 (9th Cir. 2017) (quoting

United States District Court
Central District of California

Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund, 135 S. Ct. 1318, 1332 (2015)).

Plaintiff's Consolidated Complaint fails to allege falsity with adequate particularity. In general, the Consolidated Complaint includes "[a] litany of alleged false statements, unaccompanied by the pleading of specific facts indicating why those statements are false," as was found to be deficient by the Ninth Circuit in Metzler Inv. GMBH v. Corinthian Colleges, Inc., 540 F.3d 1049, 1070-72 (9th Cir. 2008).

In Metzler Inc., the Ninth Circuit affirmed the district court's finding that the plaintiff had failed to allege falsity with particularity, even though the plaintiff had "set forth a considerable number of alleged false statements." In Metlzer, Inc., the plaintiff identified many statements regarding "disclosures of [the defendant's] current revenue projections and anticipated growth." Id. Rather than explain why each disclosure was false, the plaintiff included only a blanket, conclusory statement that all of the preceding statements were false because they did not disclose certain information regarding the defendant's allegedly deficient disclosure practices or ongoing regulatory investigations. Id. The Ninth Circuit held that the explanation "of how and why the statements were false [was] decidedly vague," since the complaint failed to draw a connection between each individual disclosure and the specific facts supporting plaintiff's conclusion that the statement was false when made or omitted material information. Id.; see also Loritz v. Exide Techs., No. 2:13-CV-02607 SVW (Ex), 2013 WL 12134142, at *3 (C.D. Cal. Dec. 19, 2013) (dismissing complaint for failure to identify the

factual allegations supporting an inference of falsity for each allegedly false statement); Patel v. Parnes, 253 F.R.D. 531, 552 (C.D. Cal. 2008) (dismissing complaint for failure to allege falsity with particularity where "[t]he allegations regarding falsity do not tie these reasons to particular statements; instead, the reasons appear to apply generally to the statements quoted in the preceding paragraphs.").

Plaintiff has structured his Consolidated Complaint in the same deficient manner. For example, paragraphs 38-43 of the Consolidated Complaint include a litany of approximately three pages of allegedly false or misleading statements. (Doc. No. 50 at ¶¶38-43). These statements were allegedly made by different Defendants at different times and in different settings; some are drawn from an October 19, 2016 press release, and others from an October 20, 2016 conference call and Q&A session with Mattel investors. (Id.). Rather than explain why each statement was false or misleading, Plaintiff includes two paragraphs that give a vague, blanket explanation for why "paragraphs 38-43 were materially false and misleading." (Id. at ¶¶45-46). Plaintiff takes this approach repeatedly and throughout the Consolidated Complaint. (See, e.g., id. at 52 ("The statements identified above in emphasis in paragraphs 49-51 were materially false and misleading. Defendants were actively engaging in a 'channel stuffing' scheme . . . . This information should have been disclosed . . . ."); see also, id. at ¶¶61, 72, 80, 85, 92). By structuring his Consolidated Complaint in this manner, Plaintiff does "not easily provide a one-to-one connection between misleading statements and the reasons why the statements are

United States District Court
Central District of California

United States District Court
Central District of California

misleading." Loritz, 2013 WL 12134142, at *2. This deficiency alone is fatal to Plaintiff's attempt to allege falsity.

Furthermore, Plaintiff has failed to allege his core channel stuffing theory with particularity. "Channel stuffing is the oversupply of distributors in one quarter to artificially inflate sales, which will then drop in the next quarter as the distributors no longer make orders while they deplete their excess supply." In re ICN Pharm., Inc., Sec. Litig., 299 F. Supp. 2d 1055, 1061 (C.D. Cal. 2004) (quoting Steckman v. Hart Brewing, Inc., 143 F.3d 1293, 1298 (9th Cir.1998)). "Channel stuffing claims are disfavored in this Circuit." In re ICN Pharm., Inc., Sec. Litig., 299 F. Supp. 2d at 1061; Wietschner v. Monterey Pasta Co., 294 F. Supp. 2d 1102, 1114 (N.D. Cal. 2003) ("Courts in this district have almost uniformly rejected the idea that allegations of channel stuffing are sufficient to plead a securities fraud violation.").

To meet the heightened pleading standards of the PSLRA for allegations of channel stuffing, a plaintiff must include sufficient corroborating details about the purported scheme. Id. at 1061–62; In re Connetics Corp. Sec. Litig., 542 F. Supp. 2d 996, 1011 (N.D. Cal. 2008). "[S]pecific transactions, specific shipments, specific customers, specific times, or specific dollar amounts," are the types of corroborating details a plaintiff needs to include to support a "channel stuffing" theory at the pleading stage. In re ICN Pharm., Inc., Sec. Litig., 299 F. Supp. at 1061–62; see also, Greebel v. FTP Software, Inc., 194 F.3d 185, 204 (1st Cir. 1999) (finding that the "complete absence" of particulars such as "the approximate amount by which revenues and earnings were overstated . . . the products involved in the

United States District Court
Central District of California

contingent transactions . . . the dates of any of the transactions; or the identities of any of the customers or . . . employees involved in the transactions" was "indicative of the excessive generality" of the allegations.).

Here, Plaintiff alleges that Defendants loaded retailers with excess products in advance of the holiday season in Q4 2016, knowing that they would then have to offer concessions to these retailers to offload excess retail inventory in Q1 2017. (See Doc. No. 50 at ¶¶2-5). Plaintiff's Consolidated Complaint does not include corroborating details of the specific transactions or the specific retailers involved in this channel stuffing scheme, however. Plaintiff also fails to identify which products were oversold by Mattel, the amount of the improper sales, or the specific dollar amounts involved in the various transactions that make up this purported scheme.

A more fundamental problem with Plaintiff's "channel stuffing" allegations is that they do not adequately support the inference that Defendants' alleged "channel stuffing" scheme was improper. In In re ICN Pharm., Inc., Sec. Litig., the district court held that the plaintiffs' channel stuffing allegations were inadequate to support an inference of improper conduct. 299 F. Supp. 2d at 1061–62. The court observed that the plaintiffs' allegations were consistent with the inherent seasonality of the pharmaceuticals in question and the drive to push sales during this time was an "ongoing practice" of "increased sales towards the end of each quarter and lower sales at the beginning of each quarter [that] would be quite transparent to investors." Id. The court reasoned that "for channel stuffing

to be improper logically it must be a short-lived scheme in which the wrongdoer attempts to capitalize on artificially increased sales before the resulting drop in sales . . . ." Id. For these reasons, the court concluded that the plaintiffs had "not pled any facts from which an inference could be made that the [d]efendants engaged in improper conduct by engaging in channel stuffing." Id.

Here, just as in In re ICN Pharm., Inc., Sec. Litig., Plaintiff's allegations suggest that there was a legitimate business reason for pushing for retail sales during Q4 2016. Specifically, "Mattel's business is highly seasonal in nature, with the majority of its retail sales occurring during the September through December timeframe." (Doc. No. 50 at ¶25). Furthermore, this was a practice that Mattel had engaged in for years, meaning that the possibility Mattel extending concessions to deal with excess retail inventory during Q1 2017 would have been a risk known by reasonable investors. (Id. at ¶97 ("Mattel had become trapped in a cycle of channel stuffing ever since its high margin fashion doll product line began to fall apart in 2014 and 2015."): id. at ¶115 ("FE3 said . . . . 'I think we did it every year'" regarding Mattel's various efforts "to entice retailers to accept excess inventory"). Plaintiff has not alleged sufficient facts to support an inference that their allegations are more than "speculation made in hindsight." See Steckman, 143 F.3d at 1298.

United States District Court
Central District of California

### B. Many of the Statements Challenged by Plaintiff Are Not Actionable

Although Plaintiff has failed to allege falsity with particularity as required by the PLSRA, it is clear that many of Defendants' statements identified in Plaintiff's Consolidated Complaint are non-actionable forward-looking statements or corporate puffery. For the reasons discussed below, these statements are not actionable to the extent that Plaintiff relies on them to support a finding of "falsity."

#### 1. Non-Actionable Puffery

A statement that is not capable of objective verification is considered "puffery" and does not constitute a material misrepresentation under the PSLRA. Oregon Pub. Employees Ret. Fund v. Apollo Grp. Inc., 774 F.3d 598, 606 (9th Cir. 2014). "When valuing corporations . . . investors do not rely on vague statements of optimism like 'good,' 'well-regarded,' or other feel good monikers . . . [most investors] know how to devalue the optimism of corporate executives." In re Cutera Sec. Litig., 610 F.3d 1103, 1111 (9th Cir. 2010) (internal quotations removed). "But even 'general statements of optimism, when taken in context, may form a basis for a securities fraud claim' when those statements address specific aspects of a company's operation that the speaker knows to be performing poorly." In re Quality Sys., Inc. Sec. Litig., 865 F.3d 1130, 1143–44 (9th Cir. 2017) (quoting Warshaw v. Xoma Corp., 74 F.3d 955, 959 (9th Cir. 1996)).

Many of the statements that Plaintiff identifies are non-actionable statements of corporate optimism. For example, Plaintiff points to the vaguely positive assessments of Mattel's progress in Q3 2016 and

United States District Court
Central District of California

Defendants' expressed optimism about Mattel's overall 2016 financial results.[1] None of these statements explain why Defendants held such confidence in the Q3 2016 results or provide details about the methodology Defendants used to assess Q3 2016 results.

Plaintiff also cites puffery regarding Defendants' optimism about the outlook for 2017.[2] In these statements, Defendants do not offer any detail to support these vague statements of optimism. For example, there is no explanation of what Defendants' "plan" for "seeing year-over-year improvement in gross margin percentages" was, or any supporting details about why Defendants were "quite pleased with Barbie's [point of sale data] performance."

---

[1] (See, e.g., Doc. No. 50 at ¶39 ("[W]e continued to make some very good progress across all of our strategic priorities. We were especially encouraged by the momentum of our top line where our positive consumer takeaway [sales] is aligning nicely with [Mattel's] shipping."); id. at ¶41 ("Overall, our third-quarter results met expectations with shipping better aligned with positive POS, which positions us well to execute the fourth quarter and deliver our challenging topline objectives for the year."); id. at ¶42 ("We've gained confidence with our results to date and believe we are well positioned to meet our challenging 2016 revenue objective of relatively flat sales in constant currency."); id. at ¶43 ("[W]hen we look at it we feel pretty confident with regard to the 48.5% [gross margin] target."); id. at ¶54 ("Today's Mattel is confident, aligned and focused on driving sustainable profitable growth . . . . Our POS and shipping are significantly improved and growing."); id. at ¶56 ("We have made significant strides in our relationships with our retail partner, which are not only resulting in increased shelf space but also allowing us to create great in-store executions.")).

[2] (See, e.g., id. at ¶58 ("[W]e do plan on seeing year-over-year improvement in gross margin percentages despite potential challenges . . . ."); id. at ¶60 ("[S]o far so good. We've been quite pleased with Barbie's trend throughout the year . . . now we're really quite pleased with Barbie's POS performance . . . . [W]e've got momentum behind the brand.")).

United States District Court
Central District of California

United States District Court
Central District of California

Plaintiff also points to tepid statements of optimism regarding Mattel's inventory levels in early 2017.[3] Defendants did not explain the meaning of phrases such as "pretty decent shape," "not a horrendous issue," or "reasonably good shape" with the level of detail that would allow a reasonable investor to rely on these statements.

None of these statements are actionable, because they use subjective and emotive terms and are not capable of objective verification. The bulk of these statements also relate to Mattel's business generally, rather than addressing concrete aspects of Mattel's operation. Even taken in context and as a whole, these statements would not give a reasonable investor an impression of a state of affairs that differed in a material way from the one that actually existed. Accordingly, the Court finds that these statements cannot form the basis for Plaintiff's claims.

**2. Non-Actionable Forward-Looking Statements**

The PSLRA creates a safe harbor for certain "forward-looking statements." "A forward-looking statement is 'a statement containing a projection of revenues, income (including income loss), earnings (including earnings loss) per share, capital expenditures, dividends, capital structure, or other financial items.'" In re Cutera Sec. Litig., 610 F.3d 1103, 1111 (9th Cir. 2010) (quoting 15 U.S.C. § 78u–5(i)(1)(A)). The safe harbor provision

[3] (See, e.g., id. at ¶70 ("I would expect we'd be in pretty decent shape on inventory as we get through the first quarter [of 2017], and it's really in pockets. So this is not a horrendous issue at this point."); id. at ¶71 ("[W]e do have to work off a little bit of inventory in some pockets."); id. at ¶79 ("On balance, though, I think we came out in Europe in reasonably good shape. Our trends were good. Our business there is fairly healthy in terms of inventory.").

United States District Court
Central District of California

applies to two types of forward-looking statements: (1) those "identified as a forward-looking statement and accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement" and (2) statements that the plaintiff fails to prove were made with actual knowledge that they were false or misleading. 15 U.S.C. § 78u–5(c)(1). "These statements cannot be a basis for liability—even if they are untrue or deceptive when made." In re Arrowhead Pharm., Inc. Sec. Litig., No. CV 16-08505 PSG (PJWx), 2017 WL 5635422, at *4 (C.D. Cal. Sept. 20, 2017). "The PSLRA's safe harbor is designed to protect companies and their officials from suit when optimistic projections of growth in revenues and earnings are not borne out by events." In re Quality Sys., Inc. Sec. Litig., 865 F.3d 1130, 1142 (9th Cir. 2017). "[W]here defendants make mixed statements containing non-forward-looking statements as well as forward-looking statements, the non-forward-looking statements are not protected by the safe harbor of the PSLRA." In re Quality Sys., Inc. Sec. Litig., 865 F.3d 1130, 1142 (9th Cir. 2017).

Defendants identify several statements in Plaintiff's Consolidated Complaint that they argue are forward-looking statements subject to the PSLRA's safe harbor provision. (Doc. No. 55-1 at 20-21; see Doc. No. 50 at ¶¶38 ("[W]e remain broadly on track to deliver on our full-year outlook."); id. at ¶39 ("This increases our confidence as we get set for the holiday season and as we look to deliver on our challenging 2016 top-line objectives."); id. at ¶42 ("[W]e don't see any significant changes to our full-year 2016 outlook . . . . [W]e will work hard to achieve a full-year gross margin of about

United States District Court
Central District of California

48.5%."); id. at ¶43 ("We feel pretty confident with regard to the 48.5% target [for gross margin]."); id. at ¶54 ("I can say with a degree of confidence that we're poised for much more improved growth and a better outlook in '17 and beyond."); id. at ¶ 55 ("Consider the fact that despite the loss of Disney Princess, we're clearly on track to fully offset that shortfall [in revenue] by the end of this year."); id. at ¶57 ("[W]e remain on track to deliver a gross margin of about 48.5% for the full year."); id. at ¶58 ("[W]e do plan on seeing year-over-year improvement in gross margin percentages despite potential challenges with mix. We expect gross margins to improve in 2017 versus 2016 . . . ."); id. at ¶66 ("Looking forward, we remain broadly optimistic about Mattel's performance in 2017 and beyond."); id. at ¶70 ("I would expect we'd be in pretty decent shape on inventory as we get through the first quarter [of 2017] . . . . [W]e'll work through the extra inventory quickly . . . .")).

When examined as a whole, the Court finds that these statements are forward-looking since they are "related to future expectations and performance" of Mattel. See Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc., 759 F.3d 1051, 1059 (9th Cir. 2014).

Although Plaintiff argues that Defendants' statements that Mattel was "on track" to reach certain financial goals are better classified as "mixed" statements (see Doc. No. 57 at 22-24), the Court finds the reasoning in M & M Hart Living Tr. v. Glob. Eagle Entm't, Inc., persuasive. No. CV 17-1479 PA (MRWx), 2017 WL 5635424 (C.D. Cal. Aug. 20, 2017). There, the Court held that an assertion "that [the defendant company] was 'on track' to meet certain future financial goals" was a forward-looking statement. Id. at *11

United States District Court
Central District of California

n.5. The Court reasoned that "the phrase 'on track' [did] not change the fact that such a statement [was] forward-looking" even though it was "based on the information available to the speaker" at that time. Id. The Court explained that this kind of reliance on present conditions of a company to make a projection is "implicit in any forward-looking statement" protected by the PSLRA safe harbor provision. Id.; Xu v. Chinacache Int'l Holdings Ltd., No. 2:15-cv-7952 CAS (RAOx), 2016 WL 4370030, at *7 (C.D. Cal. Aug. 15, 2016) (holding that statements that the defendant company was "on track to complete" a business objective were forward-looking, "[a]lthough the phrase 'on track' sounds in the present tense"); Institutional Inv'rs Grp. v. Avaya, Inc., 564 F.3d 242, 255 (3d Cir. 2009) (holding that statements using the phrase "on track" were forward-looking because the statements "when read in context, cannot meaningfully be distinguished from the future projection of which they are a part."); but see, Bielousov v. GoPro, Inc., No. 16-CV-06654-CW, 2017 WL 3168522, at *5 (N.D. Cal. July 26, 2017) (holding that the statement "[w]e believe we're still on track to make [revenue guidance for 2016] as well" was not forward-looking because it was a "statement of present opinion").

For the same reasons that Plaintiff has failed to satisfy the "scienter" requirement, Plaintiff has failed to allege that Defendants made any of these statements with actual knowledge. (See Section V below). Accordingly, these statements are protected by the PSLRA's safe harbor provision.

## V. PLAINTIFF HAS NOT ALLEGED SCIENTER ADEQUATELY

"Scienter is 'a mental state embracing intent to deceive, manipulate, or defraud.'" Police Ret. System of St. Louis v. Intuitive Surgical, Inc., 759 F.3d 1051, 1061 (9th Cir. 2014) (quoting Ernst & Ernst v. Hochfelder, 425 U.S. 185, 193 n. 12 (1976)). To plead scienter, the plaintiff must "allege that the defendants made false or misleading statements either intentionally or with deliberate recklessness." In re Daou Systems, 411 F.3d 1006, 1014-15 (9th Cir. 2005). "A securities fraud complaint will survive 'only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." Curry, 875 F.3d at 1226 (quoting Tellabs, 551 U.S. at 324). "The inference that the defendant acted with scienter need not be irrefutable, i.e., of the 'smoking-gun' genre, or even the 'most plausible of competing inferences' . . . [y]et the inference of scienter must be more than merely 'reasonable' or 'permissible'—it must be cogent and compelling." Tellabs, 551 U.S. at 324; see also In re Iso Ray, Inc. Sec. Litig., 189 F. Supp. 3d 1057, 1075 (E.D. Wash. 2016) ("A plaintiff must show that a defendant engaged in knowing or intentional conduct.") (citing South Ferry LP, No. 2. v. Killinger, 542 F.3d 776, 784 (9th Cir. 2008)).

"Omissions are actionable under [§10(b)] and Rule 10b-5 thereunder only if the party omitting the fact had a duty to disclose that fact." In re Amgen Inc. Sec. Litig., 544 F. Supp. 2d 1009, 1029-30 (C.D. Cal. 2008) (citing Chiarella v. United States, 445 U.S. 222, 230 (1980)). "Rule 10b–5 'imposes a duty to disclose material facts that are necessary to make disclosed statements, whether mandatory or volunteered, not misleading.'"

United States District Court
Central District of California

United States District Court
Central District of California

Id. at 1030 (quoting Hanon v. Dataproducts Corp., 976 F.2d 497, 504 (9th Cir. 1992)). An actionable omission "must affirmatively create an impression of a state of affairs that differs in a material way from the one that actually exists." Brody v. Transitional Hospitals Corp., 280 F.3d 997, 1006 (9th Cir. 2002). To allege that a defendant acted with scienter in omitting information, a plaintiff must plead "a highly unreasonable omission, involving not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." Zucco, 552 F.3d at 991. This requires the pleading of particularized facts that give rise to a strong inference that the defendant intended to mislead the plaintiff through its omission or knew that the plaintiff would be misled by the omission. See Amgen, 544 F. Supp. 2d at 1028-29 (denying motion to dismiss § 10(b) claim where the plaintiff had alleged facts giving rise to the inference that defendants had "actual knowledge" that its statements would mislead the public).

A court reviewing a complaint's scienter allegations conducts a two-part inquiry: first, it "determine[s] whether any of the allegations, standing alone, are sufficient to create a strong inference of scienter," and second, if no individual allegation is sufficient, it "conduct[s] a 'holistic' review of the same allegations to determine whether the insufficient allegations combine to create a strong inference of intentional conduct or deliberate recklessness." Curry, 875 F.3d at 1226 (quoting New Mexico State Inv. Council v. Ernst & Young LLP, 641 F.3d 1089, 1095 (9th Cir. 2011)). The

court must also "'take into account [any] plausible opposing inferences.'" Zucco, 552 F.3d at 990 (quoting Tellabs, 551 U.S. at 323).

Plaintiff's Complaint relies on several types of factual allegations to plead scienter: (A) statements made by Mattel's Executive Vice President and Chief Commercial Officer, Steven Totzke ("Totzke"); (B) the statements of three confidential witnesses; (C) changes in Mattel's management; and (D) Mattel's Sarbanes Oxley Certifications. The Court addresses each of these allegations in turn, and then collectively to determine whether Plaintiff's complaint as a whole raises a strong inference of scienter.

United States District Court
Central District of California

### A. Totzke's February 17, 2017 Statements

The statements made by Totzke that are included in the Consolidated Complaint were made at the February 17, 2017 Mattel, Inc. Toy Fair Presentation. (Doc. No. 50, ¶¶30, 77, 94; see also, Doc. No. 56-13). Totzke was asked to speak for his "observations about the industry, the retail environment, the evolution of the shopper and the selling process" for about ten minutes. (Doc. No. 56-13 at 20). In these brief remarks, Totzke stated that "[t]he most visible report card reflecting retail execution is still space, shelf space, promotional space and the stock levels in that space." (Id. at 22). Addressing this point, he mentioned that "since the invention of the camera phone, I get a lot of live feedback on the state of our space, and our product placement and our inventory levels. I get comments from my customers, from my brand managers, from my boss, even from many of you." (Id.; Doc. No. 50, ¶¶30, 77, 94). Plaintiff alleges that these

United States District Court
Central District of California

statements "support[] the conclusion that defendants knew of the level of Mattel's products in the retail channel prior to and during the Class Period." (Doc. No. 50, ¶94). The Court disagrees.

As Defendants point out, Totzke's fleeting reference to receiving updates on his "camera phone" and receiving "comments" from such a varied mix of sources suggests that the information he received regarding inventory levels was anecdotal and informal. (Doc. No. 55-1 at 24). Plaintiff's Complaint does not allege additional facts that would support an inference that Totzke received anything more than anecdotal information about Mattel's retail inventory levels, that he communicated such information to Defendants during the Class Period, or that the nature of his position involved communicating such information to Defendants in advance of Defendants' allegedly misleading disclosures. The Court finds that Plaintiff's interpretation of Totzke's remarks are not as "cogent and at least as compelling as [Defendants'] opposing inference." Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 324 (2007). Accordingly, the Court finds that Totzke's statements on February 17, 2017 alone do not satisfy the "scienter" requirement.

**B. Statements of Confidential Witnesses**

A complaint relying upon the statements of confidential witnesses to prove scienter must satisfy two requirements: (1) "'the confidential witnesses . . . must be described with sufficient particularity to establish their reliability and personal knowledge'"; and (2) "'those statements which are

United States District Court
Central District of California

reported . . . must themselves be indicative of scienter.'" Cutler v. Kirchner, 696 F. App'x 809, 815 (9th Cir. 2017) (quoting Zucco Partners, LLC v. Digimarc Corp., 552 F.3d 981, 995 (9th Cir. 2009), as amended (Feb. 10, 2009)). Here, Plaintiff relies in part upon the statements of three confidential witnesses to plead scienter: Former Employee 1 ("FE1"), Former Employee 2 ("FE2"), and Former Employee 3 ("FE3).

Plaintiff describes each of these confidential witnesses with specificity by numbering each witness and describing their job titles and responsibilities within Mattel. See Zucco Partners, LLC v. Digimarc Corp., 552 F.3d 981, 996 (9th Cir. 2009), as amended (Feb. 10, 2009); In re Daou Sys., Inc., 411 F.3d 1006, 1016 (9th Cir. 2005); In re Quality Sys., Inc. Sec. Litig., 865 F.3d 1130, 1145 (9th Cir. 2017). According to Plaintiff's Complaint, FE1 is "a former Mattel Senior Vice President of Global Brands from October 2014 through October 2016" who was "responsible for developing product lines, marketing strategies and distribution plans for several of Mattel's brands." (Doc. No. 50 at ¶95). FE2 is alleged to be a "Senior Customer Marketing Analyst for Mattel from February 2016 to August 2017" who "helped develop promotional plans for Mattel brands sold at Target retail outlets." (Id. at ¶106). FE3 was "Mattel's former Senior Vice President and Chief Information Officer from August 2007 to June 2017" who "was responsible for Mattel's information technology services." (Id. at ¶111).

Plaintiff's allegations must also indicate that each confidential witness had personal knowledge that would support an inference of scienter, however. The Court finds that Plaintiff has failed in this regard.

United States District Court
Central District of California

First, Defendants argue that the Court should disregard Plaintiff's allegations related to FE1, since FE1 worked in a different office from Defendants and worked on marketing, not sales. (Doc. No. 55-1 at 26). Plaintiff's allegations regarding FE1 tell a different story, however. The Consolidated Complaint indicates FE1 had direct communications with Defendants during the course of his employment. For example, Plaintiff has alleged that FE1 presented an analysis to Defendant Farr on the topic of Mattel's pattern of selling too much product to retailers who later demanded concessions to make up for the resulting shortfall. (Doc. No. 50 at ¶96). Plaintiff's allegations also make clear FE1's job duties required knowledge of Mattel's retail sales and inventory levels. (See, e.g., id. at ¶95 ("In the course of his employment, FE1 would routinely speak with representatives of Mattel's major retailers to inquire about retail sales, margins, and promotional activities."); id. ("FE1 had several conversation with Mattel's sales team during his employment, including several meetings each year attended by Mattel's sales team and led by Totzke to discuss sales for the current year and strategies and expectations for sales the following year and into the future."); id. at ¶101 (FE1 stating that he "knew precisely how much inventory is in every retailer" from weekly and monthly point of sale reports)).

Despite FE1's access to pertinent information and his direct communication with Defendant Farr, Plaintiff's allegations indicate FE1 left Mattel in October 2016–before the Class Period. (Doc. No. 50 at ¶95). Accordingly, FE1 could not have personal knowledge of the retail inventory

United States District Court
Central District of California

levels at the time Defendants' allegedly false statements were made. Since Plaintiff's theory of the case is that Defendants misled investors about unusually high levels of retailer inventory during the Class Period, Plaintiff's allegations regarding FE1 do not support an inference of scienter. See Zucco Partners, LLC v. Digimarc Corp., 552 F.3d 981, 996 (9th Cir. 2009), as amended (Feb. 10, 2009) (questioning the credibility of two confidential witnesses who were not employed by the defendant company during the time period in question); In re NVIDIA Corp. Sec. Litig., 768 F.3d 1046, 1062 (9th Cir. 2014) (statements by confidential witnesses about the defendant company's history of delaying known problems did not contribute to an inference of scienter in part because the witnesses were not employed by the defendant company during the relevant time period).

Plaintiff's allegations regarding FE2 are similarly insufficient to prove scienter. Although FE2 was employed by Mattel during the Class Period, Plaintiff's description of FE2's role within Mattel indicates she was a relatively junior marketing analyst who focused entirely on one large client of Mattel, Target. (Doc. No. 50 at ¶105). Plaintiff's allegations do not support an inference that FE2 had access to global retail inventory levels that would give FE2 knowledge that Mattel had unusually high levels of retail inventory during the Class Period. Also, since Plaintiff does not allege that FE2 had any meaningful contact with Defendants, the allegations related to FE2 do not support an inference that Defendants had any knowledge of the same inventory reports to which FE2 had access. FE2 was "simply not positioned to know the information alleged" to raise a strong inference of scienter. See Zucco Partners, LLC v. Digimarc Corp., 552 F.3d 981, 996 (9th Cir. 2009),

United States District Court
Central District of California

as amended (Feb. 10, 2009); In re NVIDIA Corp. Sec. Litig., 768 F.3d 1046, 1061 (9th Cir. 2014) (discounting statements made by former employees who "worked in an area unrelated to" the product failures at issue in the litigation).

Plaintiff's allegations regarding FE3 are similarly flawed. Although FE3 is alleged to have more direct contact with Defendants than FE2, FE3's role within Mattel was in information technology, not sales or marketing. (Doc. No. 50 at ¶111). While FE3 may have had access to the "systems that managed Mattel's inventory and manufacturing," Plaintiff has not pled sufficient facts to permit the inference that FE3 had personal knowledge of Mattel's retail inventory levels during the Class Period, let alone that he communicated such knowledge to Defendants. FE3's allegations regarding the bonus structure for upper-level management, the timing of discounts offered to retailers, knowledge of Defendants' access to sales and inventory data, and knowledge of the financial state of the company lack credibility since these issues appear to be well outside FE3's job description, and are instead based instead upon hearsay and conjecture.

As described above, Plaintiff has failed to allege that the confidential witnesses FE1, FE2, and FE3 had the requisite personal knowledge to raise a strong inference of scienter.

### C. Changes in Mattel's Management

Plaintiff alleges that changes in Mattel's management support an inference of scienter. In particular, Plaintiff points to the replacement of Sinclair as CEO in February 2017 and the resignation of Farr as CFO in July 2017. (Doc. No. 50 at ¶120). Plaintiff states that these changes "in management [were] significant" and since they "occurred immediately following the disclosures concerning Mattel's inventory, [they] suggest[] that Sinclair and Farr were in fact fired in connection with their material misrepresentations and fraudulent conduct." (Id.).

Defendants outline why these allegations are insufficient to establish scienter. (Doc. No. 55-1 at 27-28). Plaintiff offers no response in his opposition to these arguments.

As explained by Defendant, Sinclair may have been replaced as Mattel's CEO, but he stayed with Mattel as its Executive Chairman of Mattel's Board of Directors. (See Doc. No. 56-14 at 3 ("In connection with the appointment of Ms. Georgiadis as CEO, effective as of February 8, 2017, Christopher A. Sinclair will resign from his role as [Mattel's] CEO and will serve as Executive Chairman of the Board."). This continuing role at Mattel is inconsistent with a finding that Sinclair was fired for conducting a fraudulent securities scheme. See In re NVIDIA Corp. Sec. Litig., 768 F.3d 1046, 1063 (9th Cir. 2014) (holding that the departures of executives did not support an inference of scienter because two of the three executives remained at the company in an advisory role). Plaintiff's position is further undermined by the generosity of the compensation package given to Sinclair, which

United States District Court
Central District of California

United States District Court
Central District of California

included an annual base salary of $1,000,000 and the majority of the benefits he enjoyed as CEO. (Doc. No. 56-14 at 5). It is unreasonable to infer that by retaining Sinclair in a high-profile, well-paid position, Mattel was punishing Sinclair for fraudulent conduct.

Similarly, Farr announced his resignation in July 2017, but did not leave Mattel until after September 29, 2017–more than five months after the purported fraud was allegedly revealed. (Doc. No. 56-15 ("[Farr] separated from [Mattel] effective as of September 29, 2017.")). The retention of Farr as CFO for five months after the alleged fraud was exposed undermines any inference that he was fired for fraudulent acts. See City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc., 856 F.3d 605, 622 (9th Cir. 2017) ("[T]he fact that Arola remained an employee of Align for an additional six months after the first goodwill impairment announcement was made further diminishes any inference of scienter based on his resignation.").

Neither of these management changes support a strong inference of scienter. Rather, "the most reasonable inference is that these departures were benign." In re NVIDIA Corp. Sec. Litig., 768 F.3d at 1063.

**D. Mattel's Sarbanes-Oxley Certifications**

Plaintiff's Consolidated Complaint suggests that Sinclair and Farr's signatures on Mattel's Sarbanes-Oxley mandated certifications support an inference of scienter. This is incorrect. "Boilerplate language in a

United States District Court
Central District of California

corporation's 10–K form, or required certifications under Sarbanes–Oxley section 302(a), . . . add nothing substantial to the scienter calculus." Zucco Partners, LLC v. Digimarc Corp., 552 F.3d 981, 1003–04 (9th Cir. 2009), as amended (Feb. 10, 2009). Plaintiff's allegations about Mattel's Sarbanes-Oxley certifications do not support an inference of scienter.

### E. Plaintiff's Scienter Allegations as a Whole

Even taken together, Plaintiff's scienter allegations do not support the "strong inference of intentional conduct or deliberate recklessness" necessary to support a claim under the exacting standards of the PSLRA. Curry, 875 F.3d at 1226. Plaintiff's allegations are much more amenable to a benign explanation: that Defendants employed a familiar business strategy where it focused on maximizing toy sales around the winter holiday season and offering concessions to retailers to make sure consumers had access to enough of Mattel's products. Mattel then suffered the consequences of an unexpectedly slow holiday sales season exacerbated by currency fluctuations following the results of the November 2016 U.S. elections.

For the reasons above, Plaintiff has failed to allege adequately "scienter" pursuant to the PSLRA. Accordingly, the Court GRANTS Defendants' Motion.

United States District Court
Central District of California

## VI. LOSS CAUSATION

The Ninth Circuit recently held that "to prove loss causation, plaintiffs need only show a causal connection between the fraud and the loss . . . by tracing the loss back to the very facts about which the defendant lied." Mineworkers' Pension Scheme v. First Solar Inc., 881 F.3d 750, 753 (9th Cir. 2018) (internal citations and quotation marks removed); see also, Loos v. Immersion Corp., 762 F.3d 880, 887 (9th Cir. 2014), as amended (Sept. 11, 2014) ("Broadly speaking, loss causation refers to the causal relationship between a material misrepresentation and the economic loss suffered by an investor."). "[L]oss causation is a context-dependent inquiry as there are an infinite variety of ways for a tort to cause a loss." First Solar Inc., 881 F.3d at 753 (internal quotation marks removed). Loss causation "may be shown even where the alleged fraud is not necessarily revealed prior to the economic loss." Nuveen Mun. High Income Opportunity Fund v. City of Alameda, Cal., 730 F.3d 1111, 1120 (9th Cir. 2013). "A plaintiff can satisfy loss causation by showing that 'the defendant misrepresented or omitted the *very facts* that were a substantial factor in causing the plaintiff's economic loss.'" Id. (quoting McCabe v. Ernst & Young, LLP., 494 F.3d 418, 425 (3d Cir. 2007) (emphasis in original)).

Defendants argue that Plaintiff has failed to plead loss causation adequately because the disclosures at issue in Plaintiff's Consolidated Complaint did not reveal a fraudulent "channel stuffing" scheme to investors and did not explicitly correct any prior false disclosures. (Doc. No. 55-1 at 29-30). Defendants' interpret the "loss causation" element to require "a disclosure of actual wrongdoing." (Doc. No. 55-1 at 30). This is narrower

than the law requires, however. In the Ninth Circuit's most recent articulation of the test for "loss causation", a plaintiff need not plead loss causation based on a revelation of fraud to the marketplace. Instead, "[a] plaintiff may also prove loss causation by showing that the stock price fell upon the revelation of an earnings miss, even if the market was unaware at the time that fraud had concealed the miss." First Solar Inc., 881 F.3d at 754. "The 'ultimate issue [when evaluating loss causation] is whether the defendants' misstatement, as opposed to some other fact, foreseeably caused the plaintiff's loss.'" Id. (quoting Lloyd v. CVB Fin. Corp., 811 F.3d 1200, 1210 (9th Cir. 2016)).

Defendants do not appear to dispute that Plaintiff has at least alleged a correlation between the January 25, 2017 and April 20, 2017 disclosures and significant declines in the price of Mattel's stock. Instead, Defendants argue that these disclosures revealed only "non-culpable explanation[s] for the earnings miss" followed by an unsurprising stock decline." (Doc. No. 55-1 at 30). To the extent that Defendants are arguing that the stock decline was the result of non-fraudulent factors–such as an economic slowdown or volatility in currency exchange rates–such an argument is premature. Robb v. Fitbit Inc., 216 F. Supp. 3d 1017, 1033 (N.D. Cal. 2016), reconsideration denied, No. 16-CV-00151-SI, 2017 WL 219673 (N.D. Cal. Jan. 19, 2017) ("Whether the stock drop was due to other factors is a factual inquiry better suited for determination on summary judgment or trial, rather than at the pleading stage.").

United States District Court
Central District of California

United States District Court
Central District of California

In short, Plaintiff interprets the law in the Ninth Circuit more accurately than Defendants. Given the Court's finding that Plaintiff has not alleged "falsity" adequately, however, it declines to rule on the issue of loss causation at this time.

## VII. CONCLUSION

For the reasons discussed above, Plaintiff's Consolidated Complaint fails to state a claim for a violation under Section 10(b) of the Exchange Act or SEC Rule 10b-5 as required by the PSLRA. Since Plaintiffs have not adequately pled a primary violation under these provisions, the Court finds that Plaintiff has also failed to state a claim pursuant to Section 20(a) of the Exchange Act. Accordingly, the Court GRANTS Defendants' Motion. Plaintiff's Consolidated Complaint is hereby DISMISSED WITHOUT PREJUDICE. Plaintiff must file his amended complaint no later than June 25, 2018. Defendants will have thirty days from the filing of Plaintiff's amended complaint to respond.

**IT IS SO ORDERED.**

Dated: 5/24/18

Virginia A. Phillips
Chief United States District Judge